945 P.2d 1120 (1997)
133 Wash.2d 389
STATE of Washington, Petitioner,
v.
Jeremiah BOURGEOIS, Respondent.
No. 64316-4.
Supreme Court of Washington, En Banc.
November 6, 1997.
Reconsideration Denied December 3, 1997.
*1122 Norm Maleng, King County Prosecutor, Cynthia S. Gannett, Lee D. Yates, Theresa L. Fricke, Deputy Prosecutors, Seattle, for Petitioner.
Richard R. Tassano, Thomas M. Kummerow, Washington Appellate Project, Seattle, for Respondent.
*1121 ALEXANDER, Justice.
The principal issue before us is whether the trial court committed reversible error in permitting the State to elicit on the direct examination of several of its witnesses that they were reluctant to appear in court or were afraid to testify. We conclude that although this was error in all but one instance, it was harmless. We also conclude that several irregularities that occurred during the course of the trial were not sufficiently prejudicial to warrant a new trial. Consequently, we reverse the decision of the Court of Appeals and reinstate the defendant's conviction for aggravated first degree murder and first degree assault.
On May 19, 1992, a lone gunman entered the High Point Market in West Seattle and shot two of the market's co-owners, Tecle Ghebremichaele and Efram Isak. Ghebremichaele died as a result of the wounds he received in the incident. Isak survived.
Jeremiah Bourgeois, who was then 14 years of age, was subsequently arrested and charged in King County juvenile court with assaulting Isak and murdering Ghebremichaele. When the juvenile court declined to assert jurisdiction over Bourgeois, the State charged Bourgeois in King County Superior Court with first degree assault and aggravated first degree murder. The State alleged as an aggravating factor that Bourgeois shot Ghebremichaele in retaliation for Ghembremichael's testimony against Bourgeois's brother at an earlier trial. That trial arose out of a charge against Bourgeois's brother for the shooting of Ghebremichaele and the third co-owner of the High Point Market, Dagnew Andemichael, at the market on January 5, 1992.
At Bourgeois's trial, the State called Andemichael as its first witness. The deputy prosecutor asked Andemichael, "[D]o you want to be here today?" Verbatim Report of Proceedings (VRP) at 111. After the trial court rejected defense counsel's relevancy objection, Andemichael stated that he did not want to be in court and was there only because he had been arrested on a material witness warrant. Andemichael then testified about the incident that led to the charge against Bourgeois's brother.
The State's next witness was Efram Isak. Over defense counsel's objection, the trial court permitted the deputy prosecutor to ask Isak if he had come to court "completely voluntarily." VRP at 257. Isak stated that he "was arrested and [did not] want to be arrested again the next day." VRP at 257. He then testified about the May 19 shooting that led to the charges against Bourgeois. He recalled that the person who assaulted him was wearing a "mask," and he was unable to identify that person.
*1123 Frank Rojas, who was in his apartment across the street from the High Point Market at the time of the May 19 shooting, also testified on behalf of the State. In response to a question from a deputy prosecutor, Rojas stated that he did not want to be in court. When asked "why," Rojas stated, over defense counsel's objection, "Just fear, worry." VRP at 474. Rojas went on to say that he was "[f]earful of getting hurt, my family being hurt," and that he was in court only because he had been arrested on a material witness warrant. VRP at 474. Rojas testified that he had not appeared when served with a subpoena because he "didn't want to show up. [He] wanted to hide." VRP at 475.
Rojas then testified about the incident, indicating that on the evening of May 19, he noticed "J.J." [Bourgeois] walking toward the High Point Market wearing a red hooded sweatshirt. Rojas said that after looking away momentarily, he "glanced up again" and saw someone "with [a] hood over their head and a bandana over their face" walking toward the Market. VRP at 487, 490. According to Rojas, the person wearing the bandana was of the same height, gender, and ethnicity as Bourgeois. Rojas testified that although there was "some doubt in [his] mind, a little bit," the person wearing the hood and bandana looked like Bourgeois. VRP at 490. He also indicated that any uncertainty he had was a result only of "some things" he later heard in the neighborhood. VRP at 494. Rojas said that after hearing several gunshots, he turned to see the person in the bandana standing in the doorway of the High Point Market with his arm extended, apparently firing a gun.
Rojas testified that when the police arrived at the scene of the shooting, he identified himself as Frank Zamzrla and told them that he "had no idea" who the assailant was. VRP at 517. Rojas indicated further that during this first contact with the police, he selected a picture of someone other than Bourgeois from a photo montage that was shown to him. He also said that it was "possible" he told the officers that Bourgeois's brother was the assailant. VRP at 550. Rojas indicated that when the police later contacted him, he told them his true name and picked Bourgeois's picture out of the same photo montage that had been shown to him earlier. Rojas testified that he originally lied about his identity because he "had warrants," and that he purposely picked the wrong picture when first shown the montage because he was "scared for [his] family and [himself]." VRP at 519, 523.
Debra Steward, who also testified on behalf of the State, stated over defense counsel's objection that she felt "fearfulness" and "nervousness" about testifying, and that she did not want to "be involved" or "anger anybody by [her] testimony." VRP at 752. Steward also testified that Bourgeois came to her house and offered to give her and her son $120 "[t]o say that [Bourgeois] was baby-sitting [Steward's son]" on the evening of the shooting. VRP at 775. According to Steward, Bourgeois had not provided care for her son on the evening of the shooting. Finally, Steward testified that while she was leaving a party approximately a week and a half before trial, someone pushed her to the ground and said, "Don't do it, Debbie." VRP at 754. She indicated that the incident made her afraid to testify.
Manuel Parejo, a self-described "snitch" with an extensive history of felony convictions, also testified for the State. He said that prior to Bourgeois's trial, he was housed in the same section of the King County Jail as Bourgeois. According to Parejo, he and Bourgeois had a conversation in the jail about the incident at the High Point Market. Recounting what he said he learned from Bourgeois, Parejo testified: "One guy in the store had testified on his brother, and he shot the guy several times. Another guy he shot one time." VRP at 1029. According to Parejo, Bourgeois told him that he "had a white guy that was a witness that was going to lie for him" by saying that Bourgeois was at the witness's house during the shooting. VRP at 1022.
Randy Browne, a white male, was one of several witnesses who testified for the defense. According to Browne, Bourgeois arrived at Browne's house between 4:00 and 5:00 p.m. on May 19, and remained there *1124 until after "about 12:00 or 1:00." VRP at 1154. Bourgeois did not testify.
One of the trial court's instructions to the jury stated:
Evidence has been introduced in this case on the subject of the alleged willingness of a witness to testify, including, but not limited to, the alleged fear of the witness. This evidence has been admitted for the limited purpose of assessing the credibility of a witness. You must not consider this evidence for any other purpose.
Clerk's Papers (CP) at 319.
During his closing argument, the deputy prosecutor stated:
Ladies and gentlemen of the jury, the essence of this case on which you have heard evidence for approximately three weeks can be distilled to just a few words: deadly retaliation and reasonable fear of more of it. If you doubt whether or not that's an accurate distillation, consider the following: consider the fact that Dagnew Andemichael had to be threatened with a material witness warrant to get him to come here to testify.
VRP at 1322-23. Bourgeois's counsel objected to this line of argument, contending that it was beyond the scope of the above-quoted jury instruction. The trial court overruled his objection. The deputy prosecutor continued:
Consider as well Efram Isak who had to, in fact, be arrested on a material witness warrant and threatened with remaining in jail before he would testify.
Consider Debra Steward, who was so fearful she did not want to admit in open court that she was fearful because she understood that she had been pushed down recently when leaving a party apparently just one-to-two weeks before she testified.
VRP at 1323. After the trial court granted defense counsel's request for a continuing objection to this line of argument, the deputy prosecutor told the jury that Frank Rojas "expressed substantial fear about what he had seen and about the idea of testifying" and reminded them that Rojas "ultimately... had to be arrested to come in and testify in this matter." VRP at 1324. The deputy prosecutor also stated:
Who can blame any of these persons for being terrified? They have every motiveand that's the whole point of this every motive to come in here and conceal or try to minimize what they saw or what they observed, and, further, not to be as certain as they once were as to everything they had observed.
It is in this context, in the context of credibility, that you must consider the testimony that you have heard in this matter from each of these witnesses.
VRP at 1325. The jury found Bourgeois guilty of aggravated first degree murder and first degree assault.
At the sentencing hearing, the trial court notified counsel for the first time that it had learned, after the verdict had been reached, that during the trial "a young person in the audience [had] point[ed] his finger at Miss Steward[,] when she was on the witness stand testifying about her fear[,] in the manner of holding a gun." VRP (Apr. 23, 1993) at 47.
Bourgeois moved for a new trial, claiming that the gun gesture and "the court's lack of response during trial before deliberations was prejudicial and reversible error." CP at 476. At an evidentiary hearing on the defense motion, the trial court's bailiff testified that a juror told her of the gun-pointing gesture after the verdict had been read, and that she reported to the judge what she had been told. The bailiff also said that a juror approached her during the trial and told her that a spectator in the courtroom was "glaring" at witnesses. VRP (June 11, 1993) at 5. The bailiff said that she notified the trial court of the juror's comments about the glaring while the trial was underway. The trial court did not advise counsel of the alleged glaring incident, but did inform them, at sentencing, of the alleged gun-pointing.
A juror also testified at the hearing. He said that he observed two spectators in the court room, both teenage boys, glaring at Debra Steward during her testimony and "kind of staring her down." VRP (June 11, 1993) at 28. According to the juror, one of these spectators also made a gesture with his *1125 fingers as if to form a gun. The juror hypothesized that because the trial judge and counsel for the State and defendant were engaged in a sidebar conference, they did not see the gesture. The juror testified that he told the bailiff of the incident.
Another juror testified at the hearing and indicated that he noticed "people ... giving dirty looks to someone else" and "an air of intimidation" in the court room. VRP (June 11, 1993) at 20, 19. Although this juror discussed what he had seen with the other juror who testified, he did not recall being told of the gun gesture. The parties stipulated that the remaining jurors did not recall becoming aware of any unusual or inappropriate spectator action prior to rendering their verdict.
The trial court denied Bourgeois's motion for a new trial. In doing so, it concluded that the juror's act of mentioning the glaring to the bailiff did not constitute misconduct. It also concluded that the hand-gesturing constituted spectator misconduct and that the juror's mention of it to other jurors "may [have] constitute[d]" juror misconduct. VRP (June 11, 1993) at 53. Nevertheless, the court concluded that "the extrinsic evidence did not contribute to the verdict." VRP (June 11, 1993) at 64.
Bourgeois appealed the order denying his motion for a new trial[1] to Division One of the Court of Appeals. That court reversed and remanded for a new trial, concluding that the testimony regarding "fear and intimidation felt by State witnesses" served to improperly bolster their credibility before it had been put in issue. State v. Bourgeois, 82 Wash. App. 314, 319, 917 P.2d 1101, review granted, 130 Wash.2d 1008, 928 P.2d 412 (1996). The Court of Appeals concluded that this error, together with the trial court's failure to notify counsel of the juror's communication with the bailiff, violated Bourgeois's right to a fair trial. Bourgeois, 82 Wash.App. at 323-26, 917 P.2d 1101. The State petitioned for review, which we granted.

I.
The decision to admit evidence lies within the sound discretion of the trial court and should not be overturned on appeal absent a manifest abuse of discretion. State v. Crenshaw, 98 Wash.2d 789, 806, 659 P.2d 488 (1983). The State asserts that the Court of Appeals erroneously concluded that the trial court abused its discretion by permitting the State to elicit testimony, during the direct examination of several of its witnesses, that these witnesses were appearing in court involuntarily or were afraid to testify. Undergirding the State's assertion is its argument that a witness who testifies despite a fear of recrimination is more credible because of his or her personal stake in the testimony and that the jury should be able to "pass upon [such] elements of the State's case." See Supplemental Br. of Pet'r at 4.
While we feel certain that the testimony of a witness regarding his or her fear or reluctance to testify might have a bearing on a juror's evaluation of that witness's credibility, such evidence might also have another effect. It could lead the jurors to conclude that the witness is fearful of the defendant. In that sense, the testimony would have to be viewed as substantive evidence of the defendant's guilt because evidence that a defendant threatened a witness is normally admissible to imply guilt. State v. Kosanke, 23 Wash.2d 211, 215, 160 P.2d 541 (1945). Here, however, no connection was established between Bourgeois and the reluctance of any witness to testify. Thus, it should not have been admitted for that purpose. The trial court apparently understood that and, consequently, instructed the jury that it could consider a witness's reluctance or fear only in evaluating his or her credibility.
*1126 Bourgeois argues that the jury should not have been allowed to consider the testimony even for this limited purpose. That is so, he posits, because it had the additional effect of improperly bolstering the credibility of those witnesses.
Insofar as the testimony of Andemichael, Isak, and Steward is concerned, Bourgeois correctly observes that the State should not have been permitted to bolster their testimony by bringing out testimony that they were reluctant or fearful to testify. That is so because "in the absence of an attack upon credibility[,] no sustaining evidence is allowed." 1 McCORMICK ON EVIDENCE, 47, at 172 (John W. Strong ed., 4th ed.1992); accord EDWARD J. IMWINKELRIED, EVIDENTIARY FOUNDATIONS 86 (2d ed. 1989) ("The general common-law rule is that the proponent may not bolster the witness's credibility before any attempted impeachment."); United States v. Holmes, 26 F. Cas. 349, 352 (C.C.Me.1858) ("No principle in the law of evidence is better settled than ... the rule, that testimony in chief of any kind, tending merely to support the credit of the witness, is not to be heard except in reply to some matter previously given in evidence by the opposite party to impeach it."). In State v. Froehlich, 96 Wash.2d 301, 305, 635 P.2d 127 (1981), we endorsed as a "correct general statement of the law" that "corroborating evidence is admissible only when a witness' credibility has been attacked by the opposing party and, even then, only on the facet of the witness' character or testimony which has been challenged." Similarly, in State v. Petrich, 101 Wash.2d 566, 574, 683 P.2d 173 (1984), we noted that "corroborating testimony intended to rehabilitate a witness is not admissible unless the witness's credibility has been attacked by the opposing party."
Here, there was no attack on the credibility of Andemichael, Isak, or Steward,[2] nor could the State reasonably anticipate that there would be when the prosecution asked these witnesses about their fear or reluctance to testify. Nor was their credibility an "inevitable, central issue" of this case. See Petrich, 101 Wash.2d at 575, 683 P.2d 173 (discussing crimes against children as example of such a case, and noting that at least "slight" attack on credibility is required before credibility may be fortified).
Did the testimony of these witnesses about their fear and reluctance to testify bolster their credibility? We believe that it did to some extent. Although none of them testified as to specifically who or what they feared, they were permitted to impart to the jury the fact that they overcame fear to come to trial to testify. A logical effect of this testimony was to bolster their credibility. Consequently, the trial court erred in allowing this line of questioning of those three witnesses.
On the other hand, the testimony of Frank Rojas regarding his reluctance to testify was admissible because his credibility was attacked. Although the attack occurred after Rojas was directly examined by the State, it was reasonable for the State to anticipate the attack and "pull the sting" of the defense's cross-examination. See United States v. LeFevour, 798 F.2d 977, 983 (7th Cir.1986) (noting prosecution in a criminal case may "pull the sting of cross-examination" by asking damning questions of its witness on direct examination); State v. Hatupin, 99 Wash. 468, 469-70, 169 P. 966 (1918) (trial court properly allowed prosecution on direct examination to ask its witness about incriminating statements in deposition in anticipation of cross-examination). As the LeFevour court explained:
A trial is not just combat; it is also truth-seeking; and each party is entitled to place its case before the jury at one time in an orderly, measured, and balanced fashion, and thus spare the jury from having to deal with bombshells later on. It is on this theory that defense counsel, in beginning their examination of a defendant, will often ask him about his criminal record, knowing that if they do not ask, the prosecutor will *1127 do so on cross-examination. What is sauce for the goose is sauce for the gander.
LeFevour, 798 F.2d at 984 (citations omitted).
As noted above, Rojas stated that he gave police a false name. When he was first contacted by the police and was shown a photo montage, he identified the assailant as someone other than Bourgeois. He also said that when the police later contacted him, he gave them his correct name and identified Bourgeois as the person he saw running from the High Point Market. During his cross-examination of Rojas, Bourgeois's counsel attempted to bring out Rojas's uncertainty as to whom he saw running from the market as well as that Rojas placed Bourgeois at the scene only because the police were pressuring him with his outstanding warrants. Because this line of cross-examination was to be anticipated, the prosecution properly brought out during direct examination evidence of Rojas's inconsistent statements and, in order to explain the inconsistencies, testimony about Rojas's fear and reluctance to testify. In this context, testimony about Rojas's discrepant statements and his reluctance to be a witness was both relevant and properly admitted to blunt the impact of Bourgeois's cross-examination.
Having concluded that it was error for the trial court to admit the testimony of Andemichael, Isak, and Steward regarding their fear or reluctance to testify, we must next determine whether the trial court's error was of sufficient magnitude to necessitate a new trial. An error in admitting evidence that does not result in prejudice to the defendant is not grounds for reversal. Brown v. Spokane County Fire Protection Dist. No. 1, 100 Wash.2d 188, 196, 668 P.2d 571 (1983). Because the error here resulted from violation of an evidentiary rule, not a constitutional mandate, we do not apply the more stringent "harmless error beyond a reasonable doubt" standard. See State v. Cunningham, 93 Wash.2d 823, 831, 613 P.2d 1139 (1980); State v. Tharp, 96 Wash.2d 591, 599, 637 P.2d 961 (1981). Instead, we apply "the rule that error is not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred." Tharp, 96 Wash.2d at 599, 637 P.2d 961; accord State v. Halstien, 122 Wash.2d 109, 127, 857 P.2d 270 (1993). The improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole. Nghiem v. State, 73 Wash.App. 405, 413, 869 P.2d 1086 (1994).
In assessing whether the error was harmless, we must measure the admissible evidence of Bourgeois's guilt against the prejudice, if any, caused by the inadmissible testimony. On the one side, the testimony of Frank Rojas provided strong evidence that Bourgeois committed the May 19 shooting. In addition, Rojas's testimony was corroborated by a witness who indicated that he lived across the street from the High Point Market, Roland Begger. Begger testified that on the evening of May 19, he heard gunshots and then saw someone run by his window wearing a "big and bulky," red hooded jacket and a "bandana on his face." VRP at 350, 339, 340. Begger indicated that the person he saw was of the same height, gender, and ethnicity as Bourgeois. Most significant was the testimony of Manuel Parejo, who indicated that Bourgeois confessed to him that he shot two people in a store for testifying against Bourgeois's brother.
Balanced against this substantial evidence of guilt is what can only be described as the slight prejudicial effect of the testimony of Isak, Andemichael, and Steward. Andemichael testified only about the layout and neighborhood of the market, information that could have been provided by other witnesses. Although he also discussed the fact that he had been shot on January 5, that was not a disputed issue, nor reliant on credibility. Isak testified that he had been shot on May 19, but said that he could not identify the person who shot him. Moreover, as was the case with Andemichael, Isak's testimony could not be seriously contested and it was not particularly dependent on his credibility. Although Isak did describe his assailant's appearance to some degree, that description was corroborated by Rojas and Begger.
*1128 Furthermore, it is questionable whether Isak and Andemichael's testimony was significantly bolstered by their testimony that they were reluctant witnesses. Andemichael merely stated that he did not want to be in court and that he had been arrested on a material witness warrant. Isak testified that he "ha[d] to be arrested to be [in court]." VRP at 257. Neither said that they were afraid to testify. These comments merely reflect what we assume is a reluctance, common to many citizens, to get involved in court proceedings. Such reluctance could, however, be due to many reasons other than physical fear. The witness might be hesitant to miss work, fearful of speaking in public, or simply reluctant to become embroiled in a potentially time-consuming trial. Had the jury attributed the witnesses' comments to any of these factors, their testimony would not have been significantly bolstered.
Debra Steward's testimony was clearly more significant. She stated that Bourgeois had offered to pay her and her son $120 if she would falsely provide an alibi for him. Unlike the independently confirmable facts to which Andemichael and Isak testified, Steward's testimony was prejudicial to Bourgeois and subject to bolstering because of the testimony's dependence on credibility. We are satisfied, though, that the degree to which her comments about fear and a reluctance to testify actually bolstered her credibility is slight. Steward merely said that she felt "nervousness," "fearfulness," and did not want "to be involved" or "anger anybody by [her] testimony." VRP at 752, 751. These comments, we suspect, reflect the views of many witnesses and do not impart that she was fearful of Bourgeois or any other person.
In sum, we conclude that although the trial court erred in allowing several of the State's witnesses to testify on direct examination that they were afraid to testify or present in court involuntarily, we do not find that within reasonable probabilities, the outcome of the trial would have been different had they not so testified. Two of the witnesses testified as to what were essentially inconsequential matters. The facts that Steward discussed were more significant, but the bolstering effect of her testimony regarding fear and a reluctance to testify, like that of Andemichael and Isak, was slight. In light of the evidence as a whole, the error was harmless.
Bourgeois has also assigned error to the trial court rulings allowing the State to discuss during its closing argument that several of the witnesses had to be arrested on material witness warrants and that Debra Steward was afraid to testify. In light of our conclusion that the trial court erred in admitting this evidence was harmless, we conclude that the prosecution's argument based upon this evidence was similarly harmless. While arguably the prosecution put an additional gloss on this testimony, the trial court instructed the jury that counsel's arguments were not evidence and that they were to disregard any remark not supported by the evidence. The prosecutor's argument was not sufficiently prejudicial to warrant a new trial.

II.

TRIAL IRREGULARITIES
The State contends, additionally, that the Court of Appeals wrongly concluded that the trial court erred in denying Bourgeois a new trial based on what Bourgeois claimed was an improper communication between a juror and the bailiff during trial. Bourgeois argues that the Court of Appeals ruled correctly in this respect and asserts, additionally, that two other incidents of misconduct justify reversal.
In a criminal proceeding, a new trial is necessitated only when the defendant "has been so prejudiced that nothing short of a new trial can insure that the defendant will be treated fairly." State v. Russell, 125 Wash.2d 24, 85, 882 P.2d 747 (1994); see also State v. Lemieux, 75 Wash.2d 89, 91, 448 P.2d 943 (1968) ("Something more than a possibility of prejudice must be shown to warrant a new trial."). The granting or denial of a new trial is a matter primarily within the discretion of the trial court, and the decision will not be disturbed unless there is a "clear abuse of discretion." State v. Bartholomew, 98 Wash.2d 173, 211, 654 P.2d 1170 (1982) (quoting State v. Wilson, 71 Wash.2d 895, 899, 431 P.2d 221 (1967)). An *1129 abuse of discretion occurs only "when no reasonable judge would have reached the same conclusion." Sofie v. Fibreboard Corp., 112 Wash.2d 636, 667, 771 P.2d 711, 780 P.2d 260 (1989).
Bourgeois essentially points to three distinct "irregularities" in the proceedings that he claims rose to the level of misconduct justifying the grant of a new trial. First, he asserts that an allegedly improper ex parte communication occurred between a juror and the trial court's bailiff when the juror told the bailiff that spectators were glaring at Debra Steward. Second, he claims that a spectator or spectators engaged in misconduct by glaring at witnesses and gesturing as if to form a gun while Debra Steward was testifying. Finally, he asserts that jurors improperly discussed the gun-mimicking gesture and "glaring" during deliberations. We address each issue in turn.

A.
As a general rule, a trial court should not communicate with the jury in the absence of the defendant. State v. Caliguri, 99 Wash.2d 501, 508, 664 P.2d 466 (1983). The bailiff is in a sense the "alter-ego" of the judge, and is therefore bound by the same constraints. See O'Brien v. City of Seattle, 52 Wash.2d 543, 547-48, 327 P.2d 433 (1958). When an ex parte communication takes place that relates to an aspect of the trial, the trial judge "generally should disclose the communication to counsel for all parties." Rushen v. Spain, 464 U.S. 114, 119, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983). Although an improper communication between the court and the jury is an error of constitutional dimensions, State v. Rice, 110 Wash.2d 577, 613, 757 P.2d 889 (1988), the communication may be so inconsequential as to constitute harmless error, Caliguri, 99 Wash.2d at 508, 664 P.2d 466; Rushen, 464 U.S. at 118, 104 S.Ct. at 455. Once a defendant raises the possibility that he or she was prejudiced by an improper communication between the court and jury, the State bears the burden of showing that the error was harmless beyond a reasonable doubt. Caliguri, 99 Wash.2d at 509, 664 P.2d 466.
At the hearing on Bourgeois's motion for a new trial, the trial court concluded that the juror's mentioning of the glaring to the bailiff did not constitute misconduct "because there isn't any other way the Court can become aware of that type of thing unless it is brought to the Court's attention." VRP (June 11, 1993) at 52. While we can understand the trial court's reasoning, a communication did take place between the juror and the bailiff. Furthermore, the trial court failed to promptly notify counsel of it. The communication was therefore improper. Nevertheless, we are satisfied that the communication did not prejudice Bourgeois and thus, we agree with the trial court that the incident does not justify a new trial. We believe the situation here is similar to that which we examined in State v. Johnson, 56 Wash.2d 700, 709, 355 P.2d 13 (1960). There, the jurors sent the trial court a note asking for clarification of a jury instruction. The trial court wrote back that it could not comment on the evidence, and was therefore precluded from giving the requested information. Noting that the trial court "communicated no information to the jury that was in any manner harmful to the appellant," we held that the communication was improper, but not prejudicial, and therefore not a basis for reversal. Similarly, the trial court here did not communicate any information to the jurors.

B.
We next consider the alleged incidents of spectator misconduct. As the trial court noted, there were two, "one being glaring or staring behavior; and the other one being the hand-gesturing in the nature of pointing a gun at the witness." VRP (June 11, 1993) at 52. We are satisfied that the glaring did not warrant a new trial. Although glaring and other acting out by trial spectators is to be discouraged, the extent to which someone "glares," as opposed to merely staring, is largely a subjective determination. Moreover, the fact that the trial court and most of the jurors did not observe what two jurors described suggests that it was not pronounced. Absent additional evidence that the spectator misconduct here was more significant, a new trial is not warranted.
*1130 The gun-mimicking gesture is more significant. We agree with the trial court that it constituted spectator misconduct. The more pertinent question is whether it caused sufficient prejudice to warrant new trial. In determining the effect of an irregularity, an appellate court should examine (1) its seriousness, (2) whether it involved cumulative evidence, and (3) whether the trial court properly instructed the jury to disregard it. State v. Hopson, 113 Wash.2d 273, 284, 778 P.2d 1014 (1989). The gesture here could be viewed as a threat directed at Steward, which was intended to deter her from testifying against Bourgeois. Because fear and retaliation were such central themes in the State's case, the gesture arguably reinforced the impression that the defendant and his friends were the type of people that harm those who testify against them. In that sense it may have reinforced the State's theory that Bourgeois had a motive to commit the charged offenses.
On the other hand, there was no indication that Bourgeois directed the spectator to make the threat, or even that the spectator making the gesture was associated with him in any way. The juror's assumption that the spectator was a friend of Bourgeois's is irrelevant. See State v. Ng, 110 Wash.2d 32, 43, 750 P.2d 632 (1988) (jurors thought process inures in the verdict and cannot be used to impeach verdict).
The irregularity was fairly serious. Nevertheless, the trial court did not learn of it until after the trial and, consequently, was unable to instruct the jury to disregard it. We cannot say, however, that the misconduct was so significant that the defendant will have been treated unfairly unless granted a new trial. The jury was instructed that it could consider only "the testimony of the witnesses and the exhibits admitted into evidence." CP at 312. We assume that the jury followed this instruction and therefore disregarded extraneous matters. See State v. Lough, 125 Wash.2d 847, 864, 889 P.2d 487 (1995); State v. Mak, 105 Wash.2d 692, 702, 718 P.2d 407 (1986), sentence vacated on writ of habeas corpus sub nom. Mak v. Blodgett, 754 F.Supp. 1490 (W.D.Wash.1991), aff'd, 970 F.2d 614 (9th Cir.1992).
Bourgeois argues, additionally, that if the trial court had told him of the communication between the spectator and the bailiff, he could have asked to examine the juror and may have learned of the more prejudicial gun-mimicking gesture during the trial. Although we agree that the trial court should have notified counsel of the communication between the bailiff and juror immediately after it learned of it, we fail to see how Bourgeois was prejudiced by the trial court's failure to do so. If the gun-mimicking had come to light, nothing could be done to reverse the occurrence. Although Bourgeois, had he learned of the incident during trial, could have asked the trial court to specifically instruct the jury to disregard the gesture, we strongly suspect that Bourgeois would not have chosen to do so in light of the obvious fact that it would have called more attention to the incident. In any case, as we have noted above, the jury was instructed that it could consider only the testimony of the witnesses and the exhibits admitted into evidence, and we assume that the instruction was followed. We are satisfied that the incident did not prejudice Bourgeois to the extent that a new trial was necessitated.

C.
Finally, we address the alleged communication between two jurors. "The injection of information by a juror to fellow jurors, which is outside the recorded evidence of the trial ... constitutes juror misconduct." Richards v. Overlake Hosp., 59 Wash.App. 266, 270, 796 P.2d 737 (1990), review denied, 116 Wash.2d 1014, 807 P.2d 883 (1991) (emphasis omitted). In our judgment, the communication between jurors, even if it occurred, does not warrant a new trial. Significant to our determination is the fact that not one of the jurors recalled hearing about the gesture from another juror. Moreover, even if a second juror had learned of the gun gesture from a fellow juror, it is difficult to conclude that hearing of the gesture would justify reversal when seeing it does not. The communication between jurors did not justify a new trial.

*1131 CONCLUSION
We conclude that the trial court erred in admitting testimony of several of the State's witnesses to the effect that they were afraid to testify or were present in court involuntarily. Although this testimony may have improperly bolstered the witnesses' credibility, the bolstering effect of this testimony was slight and most of these witnesses testified regarding inconsequential issues or facts corroborated by other properly-admitted evidence. The error was harmless. In addition, we conclude that the trial court did not abuse its discretion in concluding that the alleged incidents of juror and spectator misconduct were not sufficiently prejudicial to warrant a new trial. Consequently, we reverse the Court of Appeals and reinstate the judgment of the trial court.
DURHAM, C.J., and DOLLIVER, SMITH, GUY, JOHNSON, MADSEN and TALMADGE, concur.
SANDERS, Judge (dissenting).
The majority concludes the trial court erred not only by allowing testimony that witnesses feared retaliation but also by allowing the prosecutor to continue a closing argument that relentlessly dwelled on such testimony. I agree the trial court erred; however, I do not agree these errors were "harmless." Such errors went to the heart of the case and the Court of Appeals thus correctly reversed, concluding "Bourgeois did not have a fair trial." State v. Bourgeois, 82 Wash.App. 314, 324, 917 P.2d 1101, review granted, 130 Wash.2d 1008, 928 P.2d 412 (1996).
From the outset the State presented its case as one of intimidation and retaliation against the victim as evidenced by ongoing intimidation of the State's witnesses. The State opened its case by asking the first witness the first question: "[D]o you want to be here today?" Verbatim Report of Proceedings (RP) (Mar. 25, 1993) at 111. Nearly every state witness was asked whether he or she felt intimidated, and at least five indicated they did.[1] One witness even elaborated explaining how she had been pushed at a party and threatened for agreeing to testify. The State further aggravated the prejudice by beginning its closing argument:
Ladies and gentlemen of the jury, the essence of this case on which you have heard evidence for approximately three weeks can be distilled to just a few words: deadly retaliation and reasonable fear of more of it. If you doubt whether or not that's an accurate distillation, consider the following:....
....
[Whereupon the prosecutor devoted much of closing argument to cataloging the various witness's current fears of intimidation].
RP (Apr. 9, 1993) at 1322-24 (emphasis added). Indeed, witness intimidation testimony ran throughout the State's case like a main circuit cable, plugged straight into Bourgeois.
The State also used the improper testimony to bolster the credibility of its witnesses. In fact because its key witnesses often had less than ideal recollection of events, the State pressed its point in closing argument that the alleged intimidation was "the whole point" and helped explain why the intimidated witnesses may have appeared "not [to] be as certain as they once were as to everything they had observed." RP (Apr. 9, 1993) at 1325.
The majority concludes the trial court erred in admitting much of this intimidation testimony. Majority at 1127. The majority acknowledges that such testimony would impermissibly lead the jury to infer guilt in the present case. Majority at 1126 ("In that sense, the testimony would have to be viewed as substantive evidence of the defendant's guilt...."). Additionally, as the Court of Appeals pointed out, because credibility had not been attacked, evidence otherwise admissible to bolster witness credibility is inadmissible. Bourgeois, 82 Wash.App. at 321, 917 P.2d 1101 (improper bolstering of witnesses is "at best distracting and at worst, as in the present case, prejudicial.").
*1132 The majority claims evidence admitted erroneously may be harmless if it is of minor significance to the overall case. Majority at 1128. But this evidence was not minor. It was inflammatory and it pertained to credibility. Credibility was central because this case involved little physical evidence and was essentially a credibility match between the State's witnesses and Bourgeois' alibi witness.
While the evidence against Bourgeois was strong, the defense raised doubts in the State's case and conviction was not a certainty. Bourgeois presented an alibi defense and the identification of Bourgeois was at times problematic. We cannot place ourselves in the jury's shoes by concluding it would still have found defendant guilty beyond a reasonable doubt. See, e.g., State v. Robinson, 24 Wash.2d 909, 917, 167 P.2d 986 (1946) ("[I]t is impossible for courts to contemplate the probabilities any evidence may have upon the minds of the jurors. The state attempts to safeguard the life and liberty of its citizens by securing to them certain legal rights. These rights should be impartially preserved. They cannot be impartially preserved if the appellate courts make of themselves a second jury and then pass upon the facts."); Bourgeois, 82 Wash.App. at 323-24, 917 P.2d 1101 ("It is not our function to reweigh the remaining evidence....") (citing Kotteakos v. United States, 328 U.S. 750, 763, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946)).
Ours is a system where an accused may be convicted only if given a fair trial and found guilty beyond all reasonable doubt as determined by a jury of peers.[2] In this case only a jury can say whether it would still convict beyond a reasonable doubt without the erroneous evidence, and a new trial is the only place the jury may speak.
NOTES
[1] Although the motion for new trial was based solely on the alleged spectator and juror misconduct issues, Bourgeois assigned error at the Court of Appeals to the trial court's ruling allowing the State's witnesses to testify that they were afraid or unwilling to testify. Br. of Appellant at ii. Both issues are properly before this court. Bourgeois's counsel objected on grounds that mention of fear or reluctance to testify was not relevant. "[A] specific objection will preserve the right to appellate review of the court's ruling on the objection...." 5 KARL B. TEGLAND, WASHINGTON PRACTICE, EVIDENCE § 10(5), at 37 (3d ed.1989); see also RAP 2.4; 2 LEWIS H. ORLAND & KARL B. TEGLAND, WASHINGTON PRACTICE, RULES PRACTICE 474 (4th ed. 1991).
[2] The State could have anticipated that Bourgeois would question Steward's credibility by inquiring into the fact that she had been drinking on the night that Bourgeois allegedly tried to bribe her into saying that he was baby-sitting. As the Court of Appeals noted, however, "[c]ross-examination on this narrow issue did not, even in retrospect, give relevance to Steward's fear of being in court." Bourgeois, 82 Wash.App. at 320, 917 P.2d 1101.
[1] None of the testimony mentioned the defendant directly as the person intimidating the witnesses. However, one inference is that defendant was involved.
[2] See Bourgeois, 82 Wash.App. at 323, 917 P.2d 1101 ("`A trial in which irrelevant and inflammatory matter is introduced, which has a natural tendency to prejudice the jury against the accused, is not a fair trial.'") (quoting State v. Miles, 73 Wash.2d 67, 70-71, 436 P.2d 198 (1968)).