# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 68736-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES RICHARD ALLEN, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: September 23, 2013 |
| | ) | |

LAU, J. — James Allen appeals two third degree assault convictions, arguing the trial court erred in failing to require jury unanimity as to which act of spitting on police officers proved each charge. He also contends the court erred in allowing trial witnesses to repeat the racial epithets he used shortly before the assaults. Because the acts of spitting formed a continuing course of conduct, we hold that no unanimity instruction was required. We also hold that any error in allowing the challenged testimony was harmless given the overwhelming evidence of guilt. We affirm.

## FACTS

On the evening of October 19, 2011, Allen attended an "Occupy Seattle" event at Westlake Park in downtown Seattle. Police officers watching the crowd witnessed Allen

fight with another person and yell racial epithets. Allen fled the crowd and collided with one of the officers. He then turned and ran for the street. After running about 10 feet, he turned to face the officers, yelled another racial epithet, and, with a "jumping lunge," spit at two of the officers. Verbatim Report of Proceedings (VRP) (Apr. 10, 2012) at 39. Neither officer was hit.[1]

Officers Gabriel Shank and Timothy Jones tackled Allen as he continued to flee. Each wore a full police uniform. Officer Matthew Pasquan handcuffed Allen and helped escort him to a patrol car. On the way to the car, Allen became combative and spit at Jones. Shank testified, "[H]e's still screaming and yelling derogatory statements, things about the police, the clowns, African-Americans, Hispanics. And then he—he just turned right at Officer Jones and spit at him." VRP (Apr. 10, 2012) at 129. Jones testified he was not hit. When asked how he avoided the spit, he said, "[Allen's] head [was] turning and I could hear him, you know, getting the spit ready." VRP (Apr. 10, 2012) at 189. Shank held Allen's hood over his face as they continued walking to the car. He explained, "I immediately reached up and grabbed the hoodie of his sweatshirt and pulled it over his face so he couldn't spit on me." VRP (Apr. 10, 2012) at 130.

At the car, Allen resumed his combative behavior. He spit at Shank and Jones as they tried to search him. Shank testified the spit hit him on his left cheek. Jones said he was not hit. Shank and Jones forced Allen to the ground. An officer placed a mesh bag, known as a "spit sock," over Allen's head. Shank testified the bag was designed to "limit large spittle and stop it from projecting at us." VRP (Apr. 10, 2012) at 134.

---

[1] The State did not charge Allen with a crime based on this conduct.

-2-

Officer Terry Bailey helped Shank and Jones maneuver Allen into the patrol car. Allen continued to struggle. After the spit sock fell off, Allen spit once more at both Shank and Jones. Bailey testified, "[H]e leaned forward and spit a couple times in Officer Jones' and Shank's face." VRP (Apr. 10, 2012) at 95. Shank testified, "This time he got it in my eyes and my mouth." VRP (Apr. 10, 2012) at 138. Jones said, "I looked up to see where the spit sock was to see if I could get it back on, and as I did that—I would say my face was probably about five inches away from Mr. Allen's face— he spit in my eye and in my mouth." VRP (Apr. 10, 2012) at 197.

The State charged Allen with two counts of third degree assault, alleging he assaulted Shank and Jones when he spit at them. At trial, the prosecutor did not specify which instance of spitting it relied on for each count. The jury returned a general verdict finding Allen guilty on both counts. Allen appeals his convictions.

## ANALYSIS

Allen contends the trial court erred in failing to require jury unanimity as to which act of spitting supported each conviction. He also contends the court erred in allowing witnesses to repeat the specific racial epithets he yelled at Westlake Park. He argues this evidence was either irrelevant or unduly prejudicial. We affirm.

### Unanimous Jury Verdict

We review alleged instructional errors de novo. State v. Sibert, 168 Wn.2d 306, 311, 230 P.3d 142 (2010). "Criminal defendants in Washington have a right to a unanimous jury verdict." State v. Ortega-Martinez, 124 Wn.2d 702, 707, 881 P.2d 231 (1994). Accordingly, when the State presents evidence of multiple acts that could each form the basis of one charged crime, "either the State must elect which of such acts is

relied upon for a conviction or the court must instruct the jury to agree on a specific criminal act [,i.e., give a Petrich[2] instruction]." State v. Coleman, 159 Wn.2d 509, 511, 150 P.3d 1126 (2007). This requirement "assures a unanimous verdict on one criminal act" by "avoid[ing] the risk that jurors will aggregate evidence improperly." Coleman, 159 Wn.2d at 512. "Where there is neither an election nor a unanimity instruction in a multiple acts case, omission of the unanimity instruction is presumed to result in prejudice." Coleman, 159 Wn.2d at 512. Reversal is required unless we determine the error is harmless beyond a reasonable doubt. Coleman, 159 Wn.2d at 512.

The necessity for a prosecutorial election or Petrich instruction arises only in multiple acts cases. It does not arise "where the evidence indicates a 'continuing course of conduct.'" State v. Handran, 113 Wn.2d 11, 17, 775 P.2d 453 (1989) (quoting State v. Petrich, 101 Wn.2d 566, 571, 683 P.2d 173 (1984), overruled on other grounds by State v. Kitchen, 110 Wn.2d 403, 405-06, 756 P.2d 105 (1988)). "To determine whether there is a continuing course of conduct, we evaluate the facts in a commonsense manner considering (1) the time separating the criminal acts and (2) whether the criminal acts involved the same parties, location, and ultimate purpose." State v. Brown, 159 Wn. App. 1, 14, 248 P.3d 518 (2010). "[E]vidence that a defendant engages in a series of actions intended to secure the same objective supports the characterization of those actions as a continuing course of conduct rather than several distinct acts." State v. Fiallo-Lopez, 78 Wn. App. 717, 724, 899 P.2d 1294 (1995).

---

[2] State v. Petrich, 101 Wn.2d 566, 683 P.2d 173 (1984), overruled on other grounds by State v. Kitchen, 110 Wn.2d 403, 405-06, 756 P.2d 105 (1988).

Allen argues the evidence establishes "three independent episodes" of spitting involving Officers Shank and Jones—first, when he spit at Jones on the way to the patrol car; second, when he spit at Shank and Jones as they tried to search him; and third, when he spit at Shank and Jones after his spit sock fell off. Br. of Appellant at 9. He argues, "[T]he three acts of spitting were at different times and different locations, thus requiring a unanimity instruction."[3] Br. of Appellant at 10.

Viewed in a commonsense manner, the evidence fails to support Allen's argument. The three acts of spitting occurred at the same location. Although Allen accurately observes that he spit on the way to the patrol car, at the car, and again inside the car, commonsense tells us that each act occurred in the near vicinity of Westlake Park. We likewise reject Allen's claim that the acts occurred at different times. All three acts occurred on the same evening, with only a brief gap between each. And while this case technically involves multiple victims, we note that Shank and Jones worked as partners on the evening in question. Each took one of Allen's arms while escorting him to the car. No evidence indicates that Allen viewed the officers as discrete victims. To the contrary, each act of spitting furthered a single criminal objective: to assault the arresting officers. The trial court did not err in failing to give a Petrich instruction.

Content of Racial Epithets

Allen next argues the trial court erred in denying his pretrial motion to exclude testimony regarding the specific racial epithets he used at the park. The ruling permitted the State to present testimony that when the police first saw Allen flee the

_____

[3] Allen may raise this claim for the first time on appeal. State v. Furseth, 156 Wn. App. 516, 519 n.3, 233 P.3d 902 (2010).

crowd, he yelled, "Fuck all those niggers and spics, they are all fucking clowns." VRP (Apr. 10, 2012) at 56. Allen contends this testimony was irrelevant and, alternatively, that the danger of unfair prejudice outweighed its probative value. He argues the trial court should have sanitized the evidence by requiring witnesses to use the term "racial epithet" in lieu of the specific language quoted above.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Stated differently, "[r]elevance means that a logical nexus exists between the evidence and the fact to be established." State v. Peterson, 35 Wn. App. 481, 484, 667 P.2d 645 (1983). "All relevant evidence is admissible, except as limited by constitutional requirements or as otherwise provided by statute, by [the Rules of Evidence], or by other rules or regulations applicable in the courts of this state." ER 402. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 403.

Because the admission of evidence rests within the sound discretion of the trial court, we will reverse the trial court's decision only if it is manifestly unreasonable or based on untenable grounds or reasons. State v. Atsbeha, 142 Wn.2d 904, 914, 16 P.3d 626 (2001); State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995). "[T]he threshold for relevance is extremely low under ER 401 . . . ." City of Kennewick v. Day, 142 Wn.2d 1, 8, 11 P.3d 304 (2000).

Citing no authority, the State asserts that testimony regarding the content of Allen's racial epithets was relevant to show his "intent to further offend the officers with his conduct."[4] Resp't's Br. at 6. It also suggests the testimony was "necessary to provide the jury a full sense of the scene and circumstances." Resp't's Br. at 6. We need not address these claims. Even if we assume without deciding that the court erroneously allowed the testimony, we conclude the error was harmless.

The improper admission of evidence constitutes harmless error if, "'within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.'" State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997) (quoting State v. Tharp, 96 Wn.2d 591, 599, 637 P.2d 961 (1981)). Stated differently, we need not remand for a new trial if we determine the improperly admitted evidence was "of minor significance in reference to the overall, overwhelming evidence as a whole." Bourgeois, 133 Wn.2d at 403.

To convict Allen of third degree assault, the State had to prove he assaulted "a law enforcement officer or other employee of a law enforcement agency who was performing his or her official duties at the time of the assault." RCW 9A.36.031(1)(g). "In order to commit assault, a person must have specific intent to cause bodily harm or to create an apprehension of bodily harm." State v. Williams, 159 Wn. App. 298, 307, 244 P.3d 1018 (2011). Specific intent can be "inferred as a logical probability from all the facts and circumstances." State v. Pedro, 148 Wn. App. 932, 951, 201 P.3d 398 (2009). The State need not prove the defendant knew the victim was a law

---

[4] Neither party argues we should apply ER 404's rules regarding character evidence.

enforcement officer at the time of the assault. State v. Brown, 140 Wn.2d 456, 468, 998 P.2d 321 (2000).

Allen never denied spitting at Shank and Jones. He testified, "I admit that I was spitting, but it was not intentional. It was not directed towards the officers directly." VRP (Apr. 11, 2012) at 53. He also testified, "I was spitting because I had saliva in my mouth and it was a scuffle." VRP (Apr. 11, 2012) at 65. In sum, Allen merely disputed whether he possessed the requisite intent to commit assault.

The State offered ample evidence from which the jury could infer Allen's intent to commit assault "as a logical probability." Pedro, 148 Wn. App. at 951. Jones testified Allen "turned" and spit at him on the way to the patrol car. VRP (Apr. 11, 2012) at 34. He noted he could hear Allen "getting the spit ready" as he turned. VRP (Apr. 10, 2012) at 189. Shank corroborated this testimony, stating Allen "just turned right at Officer Jones and spit at him." VRP (Apr. 10, 2012) at 129. Both Shank and Jones testified Allen spit at them outside the patrol car. Officer Pasquan testified, "[W]hen they tried to put him back in the patrol car, he spat at Officers Jones and Shank . . . right in their faces." VRP (Apr. 10, 2012) at 45. Pasquan noted Allen was "resistive and yelling" at the time. VRP (Apr. 10, 2012) at 45. Finally, both Shank and Jones testified Allen spit at them after the spit sock fell off in the car. Officer Bailey testified, "[T]he spit sock came off his face, just through him struggling and lifting up and me trying to pull back." VRP (Apr. 10, 2012) at 94. Allen spit when Bailey's hand slipped. Bailey testified, "[H]e leaned forward and spit a couple times in Officer Jones' and Shank's face." VRP (Apr. 10, 2012) at 95. On the way to the precinct, Shank asked Allen, "[W]hat do you have against us?" VRP (Apr. 10, 2012) at 140. Allen stated he blamed the police for the

shooting death of a wood carver earlier that year. He acknowledged his behavior responded in part to "crooked cop behavior." VRP (Apr. 11, 2012) at 62.

This testimony amply establishes Allen's intent to commit assault. It strongly suggests he acted out of anger or defiance, not inadvertence. Accordingly, even if the trial court erroneously admitted the challenged testimony, overwhelming evidence supports Allen's convictions. Because any error was harmless, we affirm.

WE CONCUR:

-9-