IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 74778-9-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JASON EDWARD RICHARDSON, | ) | |
| | ) | |
| Appellant. | ) | FILED: November 6, 2017 |

SCHINDLER, J. — A jury convicted Jason Edward Richardson of assault in the first

degree with a firearm, assault in the second degree with a firearm, and drive-by

shooting. Richardson seeks reversal. Richardson argues the prosecutor committed

misconduct by eliciting testimony that a witness agreed to testify truthfully. In the

alternative, Richardson claims his attorney provided ineffective assistance of counsel by

failing to object. Because the record does not support the argument that the prosecutor

committed misconduct and Richardson cannot establish ineffective assistance of

counsel, we affirm.

## FACTS

In May 2015, DaNielle Nasi and her two children were staying with her boyfriend

Charles Engerseth at his house in Granite Falls. Engerseth had a security system

mounted above the garage. The surveillance camera displayed images from the

driveway to a monitor in a bedroom.

At around 5:30 a.m. on May 5, Nasi watched on the security monitor as a dark-colored Ford Fusion came down the driveway. Nasi and Engerseth went to the window. Two men got out of the Ford Fusion wearing "old man, scary, Halloween masks." The passenger, later identified as Kenny Dempewolf, stood by the Ford Fusion, holding a lighter and a rag. The driver, later identified as Nasi's ex-boyfriend Jason Edward Richardson, poured gasoline on two vehicles parked outside the house. Nasi recognized the masks as belonging to Richardson.

Richardson screamed toward the house, "DaNielle, why don't you call the cops on this, too?" Nasi and Engerseth both recognized Richardson's voice and his distinctive gait. Engerseth ran outside. Richardson aimed his gun at Engerseth and fired. A bullet went through the front wall of the house, near the living room where Nasi's children were sleeping. Nasi moved the children from the living room to underneath the bed in the bedroom. Richardson continued to fire the gun at the house and at the cars.

As Richardson and Dempewolf drove away, Engerseth threw rocks at the car. Richardson fired his gun through the windshield of the Ford Fusion, shooting Engerseth in the knee. Engerseth saved two bullet fragments and a bullet casing. Nasi and Engerseth did not report what happened to the police.

Richardson and Dempewolf drove to Arlington. Richardson told Dempewolf to "get rid of" the car. Dempewolf left the car with the car door open. Dempewolf's friend Jonathon Abrahamson drove him home.

At around 7:00 a.m., Snohomish County Deputy Sherriff Steven Dosch and

Deputy Daniel Eakin responded to a report of "two people, prowlers" that "were associated with a car that they had abandon[ed]." The deputies found a Ford Fusion with the door still open and the windshield "busted out." The car smelled like gasoline. Deputy Dosch found a bullet casing on the floor of the car. After receiving information from a neighbor, Deputy Dosch located Richardson at a nearby apartment. The deputies questioned Richardson about the car and then released him.

After Child Protective Services (CPS) learned about the shooting, on May 14, CPS contacted the police about the shooting. CPS removed the children from Nasi's care. CPS told Nasi she had to cooperate with the police investigation and establish the children would be safe with her.

In July, Nasi and Engerseth met with Arlington Police Detective Rory Bolter. Nasi and Engerseth gave written and recorded statements about the shooting. Nasi turned over the security camera video from the shooting on May 5. The video showed two males in a Ford Fusion. Nasi and Engerseth identified Richardson as the shooter in the video. Nasi told Detective Bolter she believed Dempewolf was the other man in the video.

Detective Bolter accompanied Engerseth to the Cascade Valley Hospital. A doctor examined the bullet wound and took an x-ray of Engerseth's knee. The doctor did not find any bullet fragments in Engerseth's knee. After returning to Engerseth's house, Engerseth gave Detective Bolter and Sergeant Marcus Dill the bullet fragments and the bullet casing he found on May 5.

In August, Sergeant Dill interviewed Dempewolf. The interview was videotaped and Dempewolf gave a written statement. Although Dempewolf tried to "protect"

Richardson, Dempewolf admitted that on May 5, he and Richardson were at Engerseth's house and Richardson was "the person that was shooting."

The State charged Richardson with two counts of assault in the first degree while armed with a firearm and one count of drive-by shooting. Richardson pleaded not guilty.

During a defense interview, Dempewolf denied that the statement he made to Sergeant Dill was true. Dempewolf told the defense attorney, "I wasn't there. . . . I had never been to [Engerseth's house]."

The State subpoenaed Dempewolf to testify at trial. At a pretrial hearing, the prosecutor noted the possibility of treating Dempewolf as a hostile witness because "[w]e don't quite know what he's going to say." The prosecutor told the court, "[W]e're not really sure what's going to happen" because Dempewolf had given conflicting versions to the police and the defense. When Dempewolf did not appear to testify on the first day of trial, the court issued a material witness warrant.

The State called several witnesses to testify, including Nasi, Engerseth, Deputy Eakin, Deputy Dosch, and Washington State Patrol Crime Laboratory (WSPCL) forensic scientist Brian Smelser. The court admitted more than 30 exhibits into evidence, including the security camera video.

Nasi testified she dated Richardson for three weeks but the relationship ended "poorly." Nasi said she and the children sometimes stayed in a trailer on Engerseth's property.

Nasi said that on the morning of May 5, she saw a man get out of the driver's side of the car wearing an "old man, scary, Halloween" mask. Nasi testified that she

saw the "exact" mask "[a]t [Richardson]'s house." Nasi knew the shooter was Richardson after he screamed, "DaNielle, why don't you call the cops on this, too?" Nasi said no one else pronounced her name "the way [Richardson] did." Nasi also testified Richardson has a "distinct walk . . . when he's upset."

Engerseth testified he had met Richardson and recognized his voice when he yelled, "DaNielle, call the cops on this." Engerseth said the shooter fired through the windshield and hit him "right above the knee."

Deputy Eakin testified the Ford Fusion he and Deputy Dosch found abandoned in Arlington had damage to the windshield "consistent with a bullet hole." Deputy Dosch identified the bullet casing he found on the floor of the car. WSPCL forensic scientist Smelser testified the bullet casing found in the Ford Fusion and the bullet casing Engerseth gave to the police were fired from the same gun.

The State played the security camera video for the jury. The video shows a dark-colored car driving up the driveway. Two men get out of the car wearing masks. The driver pours gasoline on two nearby cars. The driver walks toward the house waving his arms, pulls out a gun, and fires at the house. The two men get back in the car and begin to drive away. The video shows Engerseth throwing objects at the car and a bullet fired through the windshield at Engerseth. Engerseth then doubles over and limps away.

Dempewolf testified on the third day of trial. Dempewolf testified that he met with Nasi at a pizza parlor in Everett the day before. Dempewolf said Nasi showed him the security camera video and told him her children were in the house during the shooting. Dempewolf testified he did not know the children were in the house, "Otherwise I would

have never been there."

Dempewolf said he knew Richardson "[p]retty much all my life." Dempewolf said he was at Richardson's house on May 5 and was "helping him clean his garage." Dempewolf agreed to drive to Granite Falls "to pick up [Richardson's] car and . . . I would help him . . . drive it back." Dempewolf testified there were two "funny-looking masks" and a container of gas in the car. Dempewolf said when they reached the house, Richardson "got out first." Richardson grabbed the gas container and poured gas on the cars. Richardson "told everybody to come out." "[A]fter the man came out of the house," Richardson fired his gun toward the house. Dempewolf said Richardson also fired his gun "from inside of the car."

Dempewolf testified the State agreed not to charge him with a crime if he testified truthfully. The defense did not object.

On cross-examination, Dempewolf admitted giving different statements about the shooting. In his first statement to Sergeant Dill, Dempewolf identified Richardson as the shooter. But Dempewolf testified he told Sergeant Dill that "maybe there was an airsoft gun" because he was "trying to cover for [Richardson]." Dempewolf admitted that in an interview with defense counsel, he denied being at Engerseth's house and said that "everything I told [Sergeant Dill] was untrue." Dempewolf testified on cross-examination that he would not get immunity if he testified to "something that [the prosecutor] doesn't think is the truth."

The defense called Nasi to testify. Nasi testified that after she learned Dempewolf was not going to testify, she met with him at a pizza parlor and showed him the security camera video. Nasi testified that she asked Dempewolf why Richardson

walked toward the trailer on Engerseth's property when he first got out of the car. Nasi said she told Dempewolf that her children were in the house during the shooting and her "kids deserved to have him testify." Nasi said she asked Dempewolf to testify "because it's the right thing to do, because I'm afraid that other things would happen to other people."

In closing, the State did not refer to Dempewolf's agreement to testify. The defense argued Dempewolf was not credible and only identified Richardson as the shooter to get immunity from charges.

> [T]he only way [Dempewolf] gets immunity is if he says what [the prosecutor] believes the truth to be. He testified to that. And that was in his agreement . . . .
> If he were to . . . say what he said to [defense counsel], he would not get immunity and would be charged.

The jury found Richardson not guilty of one count of assault in the first degree while armed with a firearm. The jury found Richardson guilty of the other count of assault in the first degree while armed with a firearm, the lesser included crime of assault in the second degree while armed with a firearm, and drive-by shooting.

ANALYSIS

Prosecutorial Misconduct

Richardson argues the prosecutor improperly vouched for the credibility of a witness because Dempewolf testified that the immunity agreement required him to tell the truth.

To prevail on a claim of prosecutorial misconduct, the defendant must show the prosecutor's conduct was improper and prejudicial. State v. Ish, 170 Wn.2d 189, 195, 241 P.3d 389 (2010). We review alleged prosecutorial misconduct "in the context of the

7

total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury." State v. Allen, 161 Wn. App. 727, 746, 255 P.3d 784 (2011).

If the defendant does not object or request a curative instruction at trial, the defendant waives the misconduct issue "unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." State v. Emery, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). Under this heightened standard, the defendant must show "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" Emery, 174 Wn.2d at 761 (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)). We focus "less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." Emery, 174 Wn.2d at 762.

It is improper for the prosecutor to vouch for the credibility of a witness. Allen, 161 Wn. App. at 746. Improper vouching occurs "if the prosecutor expresses his or her personal belief as to the veracity of the witness." Ish, 170 Wn.2d at 196.

But where the State reasonably anticipates the defense will attack the credibility of a witness, the prosecutor may ask a witness about an agreement to testify on direct examination. State v. Bourgeois, 133 Wn.2d 389, 402, 945 P.2d 1120 (1997); see also Ish, 170 Wn.2d at 199 n.10 (a party may preemptively rehabilitate a witness during its case-in-chief where there is "little doubt" of an anticipated attacked). However, the State may not ask a witness about his "promise to testify truthfully during direct examination." Ish, 170 Wn.2d at 199.

Here, it is undisputed the State reasonably anticipated the defense would attack the credibility of Dempewolf. Richardson concedes the State could ask Dempewolf on direct examination about the agreement to testify. And, unlike in Ish, the record shows the prosecutor did not ask Dempewolf whether he promised to testify truthfully.

On direct examination, the prosecutor asked Dempewolf, "And what did that agreement order you to do?" Dempewolf responded, "You told me to tell the truth." The defense did not object. The prosecutor immediately rephrased the question to clarify Dempewolf agreed to testify in exchange for immunity.

> Q.    You are receiving something in exchange, are you not?
> A.    What do you mean?
> Q.    . . . Isn't it true that my office has agreed not to prosecute you for being there at the time?
> A.    Yes.
> Q.    In exchange that you have to testify today?
> A.    Yes.

Dempewolf's unsolicited testimony that "[y]ou told me to tell the truth" was not flagrant and ill-intentioned prosecutorial misconduct. See State v. Hughes, 118 Wn. App. 713, 725-26, 77 P.3d 681 (improper response on truthfulness not flagrant and ill-intentioned misconduct because the prosecutor's question was open-ended and the answer was unsolicited). The record shows the prosecutor asked an open-ended question, Dempewolf gave an improper response, and the prosecutor immediately rephrased the question. If the defense had objected, a curative instruction could have "obviated any prejudicial effect." Emery, 174 Wn.2d at 761.

Richardson also fails to show a substantial likelihood that the unsolicited response affected the jury verdict. Ish, 170 Wn.2d at 200-01. Richardson argues

Dempewolf's testimony was necessary to identify Richardson as the shooter. Contrary to his argument, the record shows the State presented other evidence identifying Richardson as the shooter. The State played the security camera for the jury. Nasi and Engerseth knew Richardson by his voice and gait. Nasi saw the "exact masks" Richardson and Dempewolf were wearing at Richardson's house. Nasi recognized Richardson's voice because of the distinct way he mispronounced her name. Although Richardson argues Nasi and Engerseth had motive to lie, credibility determinations are for the trier of fact. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

Ineffective Assistance of Counsel

In the alternative, Richardson claims his attorney provided ineffective assistance of counsel by failing to object to Dempewolf's testimony that the prosecutor told him to tell the truth.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). We review claims of ineffective assistance of counsel de novo. State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

To prevail on a claim of ineffective assistance of counsel, the defendant must show both (1) that defense counsel's representation was deficient and (2) that the deficient representation prejudiced the defendant. Grier, 171 Wn.2d at 32-33. If a defendant fails to establish either prong, we need not inquire further. Strickland, 466 U.S. at 697; State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). "Deficient

performance is performance falling 'below an objective standard of reasonableness based on consideration of all the circumstances.' " State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009) (quoting State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)).

There is a strong presumption of effective representation of counsel and that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 689. The defendant has the burden to show that based on the record, there are no legitimate strategic or tactical reasons for the challenged conduct. McFarland, 127 Wn.2d at 335-36.

The record shows defense counsel made a strategic decision not to object and to use the testimony that Dempewolf agreed to testify truthfully to impeach his credibility. During extensive cross-examination, defense counsel focused on the inconsistencies in the five different statements Dempewolf gave to the police and the defense. Dempewolf said he agreed to testify "in the State's case against Mr. Richardson" because the State would "not charge [him] with any crime." Dempewolf testified that he would get immunity only if he "testif[ied] to what, in [the prosecutor]'s judgment, is the truth," and the prosecutor "gets to decide what the truth is." Because the record shows the decision not to object was strategic, Richardson cannot establish ineffective assistance of counsel.

Statements of Additional Grounds

Richardson raises several additional grounds for review under RAP 10.10(a).

Richardson claims the police and prosecutor engaged in misconduct and the trial court violated his right to a speedy trial by granting continuances. Because his

arguments rely on "matters outside the record," we cannot review these arguments on direct appeal. McFarland, 127 Wn.2d at 337-38; RAP 10.10(c).

Richardson also claims the court erred by giving an improper jury instruction on recklessness. We disagree. The cases Richardson cites are inapposite. Under RCW 9A.36.045, the mental state for drive-by shooting is recklessness. The court correctly used 11 Washington Practice: Washington Pattern Jury Instructions: Criminal 10.03, at 225 (4th ed. 2016), to instruct the jury on the definition of "recklessness," consistent with RCW 9A.08.010(1)(c) and (2).

Richardson asserts his attorney provided ineffective assistance of counsel by failing to call an expert medical witness to testify on whether Engerseth suffered a gun shot wound. Because the decision not to call an expert witness falls within trial strategy, Richardson cannot establish ineffective assistance of counsel. See State v. Mannering, 150 Wn.2d 277, 287, 75 P.3d 961 (2003).

We affirm.

WE CONCUR:

12