IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37159-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| T.P., | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — T.P. appeals his conviction, in juvenile court, for rape. He claims that the trial court admitted inadmissible and prejudicial testimony from the alleged victim's parents as to her reputation for truthfulness. We agree and reverse his conviction. Because the juvenile court repeatedly admitted the inadmissible evidence, because of the critical nature of the victim's credibility, and because the court considered all evidence when finding guilt, we decline to apply the presumption that the trial court, in a bench trial, never considered inadmissible evidence when rendering a verdict.

FACTS

We glean the facts from testimony during a juvenile court bench trial.

T.P. and A.S., both 14 years old, attended the same junior high school. They never interacted, however, until T.P. posted a "story" on Snapchat, a multimedia messaging

app. Report of Proceedings (RP) at 64. Snapchat permits the posting of messages, stories, and pictures, which expire from the application after twenty-four hours. T.P. inquired if anyone wanted to "kick it," a chic term for relaxing with a friend. RP at 64. A.S. responded affirmatively, and she and T.P. spent time together at a park near the school later that day.

During their first encounter, T.P. repeatedly told A.S. that he wanted to have sex and suggested that the two retire to the bushes. A.S. repetitively declined.

Over the next weeks, T.P. and A.S. continued to socialize. Eventually T.P. visited A.S.'s home and became acquainted with A.S.'s parents. Neither T.P. nor A.S. know the number of times T.P. visited A.S.'s home. When at A.S.'s home, the two fourteen-year-olds played video games in A.S.'s bedroom. When apart, the two exchanged messages over Snapchat. Screenshots of some of the virtual messages show T.P.'s repeated requests to finger A.S.'s vagina. A.S. rejected the overtures. T.P. eventually announced his termination of the relationship due to A.S.'s lack of interest in his advances. Initially, A.S. concurred in ending the relationship.

After two days of cessation of contact, A.S. contacted T.P. and told him that she would buy him a fancy coffee if he came and spent time with her at her home. T.P. accepted the invitation and came to A.S.'s home. A.S.'s parents were home, and the two went to A.S.'s upstairs bedroom and left the door open. While A.S. applied makeup in a nearby restroom, T.P sat on her bed and played a video game. The bathroom is located

near A.S.'s room but is not adjoining. T.P. later entered the restroom and twice attempted to force his hands down A.S.'s pants. A.S. told him no, and she moved his hand. An angry T.P. returned to the bedroom and continued playing video games.

After applying her make-up, A.S. returned to the bedroom and sat on the bed with T.P. T.P. abruptly rested his videogame controller and kissed A.S. A.S. reciprocated T.P.'s kisses. But then, according to A.S., T.P. pushed A.S. down on the bed. T.P. sat on A.S. and repeatedly attempted to place his hands down her pants. A.S. constantly said "no" and "stop," while moving his hand from her private area. According to A.S., T.P. held A.S.'s defensive hand and inserted a finger from another hand into her vagina. After an indiscernible period of time, T.P. got off A.S. He pulled his penis from his pants and twice demanded that A.S. perform oral sex. A.S. responded "no" each time. A.S.'s parents then called T.P. and A.S. downstairs to get coffee. A.S. testified to an awkward car ride to the coffee shop, and she does not recall whether T.P. stayed for dinner. She described the time until he went home as a blur.

Two months after the incident, A.S. disclosed T.P's conduct to her ex-boyfriend. Even months later, she disclosed the T.P.'s fingering of her vagina to her parents, who reported the occurrence to law enforcement.

Douglas County Sheriff Detective Ramon Bravo interviewed T.P., and, at trial, the court listened to the recording of the interview. T.P. told Detective Bravo that he visited A.S.'s home two or three times and communicated with her through Snapchat. T.P.

3

acknowledged that, on one occasion while visiting, he and A.S. kissed and he went into the bathroom to see where A.S. had gone. In the bathroom, he talked to her. A.S.'s dad came upstairs, and he and T.P. talked. T.P. told the detective that he wished to finger T.P, but did not attempt such conduct because of the presence of A.S.'s parents in the residence.

## PROCEDURE

The State of Washington charged T.P. with rape in the third degree. At trial, the State called four witnesses: A.S., A.S.'s mother, A.S.'s father, and Detective Ramon Bravo. A.S.'s parents testified before she did.

On direct examination, A.S.'s mother testified that, since the alleged incident in her home, A.S. became more depressed. A.S. had nightmares, took additional medication, and her appetite decreased. The prosecution then inquired into A.S.'s reputation for truthfulness:

> Q Does A.S. have a reputation in the community as being somebody who makes things up?
> MR. BARKER [Defense Counsel]: Well, first you have to define the community, so I'm going to object to that as well. And who she talked to about this, etc.
> THE COURT: The Court will overrule that objection.
> [A.S.'s mother]: No, she's not the kind of person that would make something up, no.
> . . . .
> Q Does she have a reputation in the community as being somebody who would do things purely for attention?
> Mr. BARKER: Same objection, Your Honor . . . he's asking for character evidence once again.

4

. . . .
THE COURT: I'll allow that question.
[A.S.'s mother]: No, she does not.

RP at 45-46.

On cross-examination, defense counsel questioned A.S.'s mother regarding from

whom she gained knowledge of A.S.'s reputation for truthfulness:

Q  Have you ever talked to anybody about her rep—about her
making things up?  Anybody?
A  No.

RP at 46.

Defense counsel proceeded to ask the mother questions related to her and A.S.'s

father's decision to homeschool A.S. at the time the alleged incident took place.

Q  And A.S. back in March was homeschooled, is that correct?
A  Yes.
Q  When did she start homeschooling?
A  She started homeschool January 29th—well, she started this year,
January 29th was the first day that she started homeschool this year.
Q  What about last year?
A  Last year she went to the junior high for 8th grade.
Q  What about the year before that?
A  She was homeschooled for her 7th grade year.
Q  And she was homeschooled because she was having troubles in
school, true?
A  She was being bullied.
Q  She was be calling—been calling names by people in school?
A  Yes.
Q  Other girls?
A  Yes.
Q  They were calling her a slut?
MR. PARRISH [State's Attorney]: I'm going to object as to
relevance, Your Honor.

5

THE COURT:  Mr. Barker?

MR. BARKER: He brought up her depression, Your Honor.  I think I should be allowed to explore that depression.

MR. PARRISH: Your Honor, but that was as to effects of a particular incident in a point in time.  I don't know that delving into a 15-year-old's juvenile educational and social history is appropriate.

MR. BARKER: He timed it, I didn't it.

THE COURT: For now, I'll allow the question.

BY MR. BARKER:

Q  Is that true?

A  Yes.

Q  And so you chose to homeschool her?

A  Yes, I did.

Q  And you're saying she wasn't depressed at that time?

A  Not—no.

Q  Okay.  So she's being bullied at school, you decide to take her out of school in order to get rid of that.

A  Yes.

Q  And she's not depressed—that's your testimony?

A  Yes.

RP at 46-48.

Because A.S.' mother admitted she spoke with no one regarding A.S.'s reputation, defense counsel moved to strike her statements regarding A.S.'s reputation about fabricating untruths.  In response, the State argued that A.S. must have a truthful reputation, otherwise someone would have complained to her mother.  The court denied the motion to strike while reasoning that, since no one had spoken to the mother about A.S. possessing a reputation for lying, A.S. must not have a reputation for prevaricating.

During the questioning of A.S.'s father, the prosecution repeated a similar line of questioning.

6

> Q  Mr. [S.], to your understanding, does A.S. in the community have a reputation for truthfulness?
> A  Yes.
> MR. BARKER: Again, I would object.  Now he's asking a leading question and he's also asking the wrong question for character evidence.  He's not laid any foundation for why this particular witness would have any indication as to why that's true.
> MR. PARRISH: I don't believe that's necessary, Your Honor.
> MR. BARKER: I understand you don't, but the Rule does.
> THE COURT: I'm going to overrule the objection.

RP at 56-57.

A.S.'s father testified that his daughter battled depression, encountered difficulty cultivating friendships, and spent time in her room alone.  He described her emotional state, before the alleged rape, as "[v]ery outgoing; very bubbly personality; would introduce herself to anybody."  RP at 53.  On cross-examination, the father conceded that A.S. suffered from depression before the rape and he observed no changes in A.S.'s personality on the day of the incident.

A.S. testified to the events in her bedroom on the day of the charged crime.  T.P.'s counsel asked her no questions on cross-examination.  The defense did not call any witnesses to testify.

In closing argument, defense counsel asked the juvenile court to find that A.S. consented to the sexual fingering.

> [T]he Court has to think about what this case is really about.  It's not about whether or not sexual activity occurred because it did.  Whether or not it consensually occurred because it did.  They kissed—she testified that

7

they made out.  What does that mean?  We never really got into it—made out; made out how; made out how much?

. . . .

What this case is about is her intention.  It's not about his intention  . . .  She tells him after he says well I'm not going to hang out with you if you don't let me do that and then she contacts him, but she puts a carrot in front of him that says look, I'll take you out for coffee; I'm attracting you to me.  That is her intention.  And her intention knows what his intention is.  *At that moment in time, even if we believe everything that A.S. says, it's her intention at that moment in time to do that and she's told him that by her actions.*

So there's not a lack of consent here.  There is a consent at the very beginning of this.  Now, does that change; does it not change?  I don't know; I wasn't there and the Court wasn't there.  But what clearly happened was she invited him over for a purpose that she knew—she did; there's no question about that.

. . . .

So what the Court is left with here is absolutely no physical evidence, absolutely no crying out during the time or anybody knowing that something is happening upstairs—you know, there's other people in the house right downstairs.  There's no other corroborative evidence there.  What we have is two people that say it happened in a different way.  And I don't think that's beyond a reasonable doubt.  . . .

. . . .

. . . [H]e's clearly saying this is what I want to do, this is what I'm going to do, and I'm not going to hang out with you anymore if you don't let me do it.  And then she asks me to hang out.  I don't know what—what more of a yes you can say there.  So I would suggest to the Court that there is obviously reasonable doubt as to what happened, based upon A.S.'s intention.

RP at 95-98 (emphasis added).  Defense counsel made no reference to A.S.'s credibility other than the comment: "even if we believe everything that A.S. says. . . ."  RP at 96.

The juvenile court convicted T.P. of third degree rape.  At the conclusion of the closing statements, the court declared:

The Court has heard the evidence. I would note that, as Mr. Barker stated, there really isn't an issue about the act. The issue is whether consent was given.

The statute, RCW 9A.44.060(1)(a), talks about where the victim did not consent, as defined by statute, to sexual intercourse—again, which is a statutorily defined term—with the perpetrator—and here's the key part—and such lack of consent was clearly expressed by the victim's words or conduct. So the issue appears to be whether the State has proven beyond a reasonable doubt that there was lack of—whether, among other things—there was lack of consent and such lack of consent was clearly expressed by the victim's words or conduct.

T.P., I think you've got a skilled and experienced attorney and he has made what appear to be probably the only arguments that could be made on your behalf. I feel like these text messages—or Snapchat messages, rather—probably in real time weren't given so much thought or scrutiny as they've been given today. Probably they're—I know I've personally looked—a lot of attention and a lot of care in reviewing those Snapchat messages, probably well beyond what was intended.

I do note, however, though, that although there was certainly some forward talk and there was certainly some expression of what you intended to do, there—it is equally clear that there was a—a lack of consent, at least at that time, from A.S. as to what—her thoughts as to what you intended to do.

Even if, as Mr. Barker argued, she had given consent—and that's not what I see in the text messages. Even if she had given such consent, that consent would not be irrevocable. And the case law books are filled with cases where victims or alleged victims maybe even at some earlier point in time gave consent, but they withdrew consent.

And the Court is mindful that there are—there were the multiple incidents in the home. There was the first incident in the bathroom. And I'm not—and then there was the incident on the bed itself. The third incident, I—that Mr. Parrish mentioned, I don't give much, if any, weight to. It certainly doubles down, if you will, on what T.P.'s intentions were, but in terms of the crime itself, it was the second incident on the bed where—that is key.

And it is this Court's finding and conclusion that there was a lack of consent and that such lack of consent was in fact clearly expressed by the victim's words or conduct. And this is based on the evidence that was

9

produced at trial. So the Court does find the Defendant guilty of Rape in
the 3rd Degree.

RP at 101-03.

The juvenile court entered written findings of fact that focused on a lack of

consent by A.S. to the fingering of her vagina. The findings do not explain how the trial

court arrived at the factual conclusion that T.P. fingered A.S. without her consent. The

court prefaced the findings by writing: "[u]pon hearing the testimony of the witnesses."

Clerk's Papers (CP) at 41.

## LAW AND ANALYSIS

On appeal, T.P. assigns four errors to trial court proceedings. First, the trial court

mistakenly permitted A.S.'s parents to testify to her reputation. Second, his trial counsel

performed ineffectively when arguing that T.P. fingered A.S. with A.S.'s consent after

T.P. had denied any sexual touching to Detective Ramon Bravo. Third, the trial court

exceeded its authority when ordering twenty-four months of community supervision.

Fourth, the order of disposition contains a clerical error. We agree with T.P.'s first

assignment of error, so we do not address the remaining assignments.

T.P. argues that the prosecution never laid the foundation required by evidence

rules to show A.S.'s parents belong to a general and neutral community such that they

could testify to any reputation that A.S. had in the community. In response, the State

presents no analysis of the rules of evidence concerning bolstering the credibility of the

victim or presenting reputation testimony. The State may imply that the reputation testimony did not need to comply with the rules. The State instead contends that the parents could corroborate A.S.'s credibility because of the prospect of the defense seeking to impeach the credibility of A.S. and because of defense counsel asking questions about A.S. being called a slut. The State also contends that, assuming any error in the admission of the parents' testimony, this court must assume that the trial court ignored the inadmissible evidence when convicting T.P. of the crime of rape.

The arguments of the parties raise the following questions. First, may the proponent of testimony concerning the victim's reputation for veracity present the testimony before the victim's credibility is attacked? Second, does a reference to the victim as a slut embody a challenge to the victim's character for truthfulness? Third, does the defense's breach of the rape shield statute permit the State to question a witness about the reputation of the victim for truthfulness? Fourth, may a witness testify to the reputation of the alleged victim of rape without first identifying any community in which the victim purportedly has garnered a reputation for truthfulness? Fifth, may a parent testify to the reputation of his or her child for truthfulness based on the lack of any negative comments to the parents about the child lying? Sixth, assuming the trial court, during a bench trial, erred in listening to testimony concerning the reputation for truthfulness of the prime witness and victim, should this court assume that the trial court never considered the testimony, when convicting the accused, despite the court three

times declining to exclude the testimony and despite the credibility of the accused and the

victim being key to the trial outcome?  Some of the questions overlap.

*Timing of Reputation Testimony*

We first address under what circumstances the State may present testimony of the

victim's reputation for truthfulness.  Identifying these circumstances helps us answer the

many other questions.

ER 404(a) controls the State's attempt to bolster the credibility of the victim and

reads, in relevant part:

> **Character Evidence Generally.**  Evidence of a person's character
> or a trait of character is not admissible for the purpose of proving action in
> conformity therewith on a particular occasion, except:
> . . . .
> (2) *Character of Victim*.  Evidence of a pertinent trait of character of
> the victim of the crime offered by an accused, *or by the prosecution to
> rebut the same*, or evidence of a character trait of peacefulness of the victim
> offered by the prosecution in a homicide case to rebut evidence that the
> victim was the first aggressor[.]

(Some emphasis added.)  In turn, ER 608(a) controls evidence about a witness's

reputation for truthfulness, which we assume also extends to a victim who becomes a

witness.  This latter rule declares:

> **Reputation Evidence of Character.**  The credibility of a witness
> may be attacked or supported by evidence in the form of reputation, but
> subject to the limitations: (1) the evidence may refer only to character for
> truthfulness or untruthfulness, and (2) *evidence of truthful character is
> admissible only after the character of the witness for truthfulness has been
> attacked* by reputation evidence or otherwise.

(Emphasis added.)

The State may not bolster a witness's testimony in the absence of an attack on credibility. *State v. Bourgeois*, 133 Wn.2d 389, 400, 945 P.2d 1120 (1997); *State v. Petrich*, 101 Wn.2d 566, 574, 683 P.2d 173 (1984) *abrogated on other grounds by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988); *State v. Froehlich*, 96 Wn.2d 301, 305, 635 P.2d 127 (1981). Stated more emphatically and verbosely, testimony in chief of any kind, tending merely to support the credit of the witness, is not to be heard except in reply to some matter previously given in evidence by the opposite party to impeach it. *State v. Bourgeois*, 133 Wn.2d at 400. Once the defense assaults the veracity of the State's witness, the State may present contradicting evidence of truthfulness no matter how "slight" the attack. *State v. Petrich*, 101 Wn.2d at 575.

The State questioned A.S.'s mother about her daughter's reputation in the community for being somebody who fabricates untruth before A.S. testified and even before T.P.'s counsel cross-examined the mother. We recognize that T.P. did not object to the questioning of the mother based on the lack of an earlier attack on A.S.'s truthfulness. Nevertheless, because the State justifies questioning the mother based on an anticipated attack on A.S.'s credibility and because the State impliedly argues that it need not have followed the evidence rules addressing testimony regarding a reputation for truthfulness, we rule that the trial court should not have permitted the mother to testify to a reputation of A.S. in the community to concoct falsehoods.

13

The State responds that the law allowed it to present evidence of A.S.'s reputation for truthfulness in anticipation for a later attack by the defense on A.S.'s credibility. In support of its contention, the State cites *State v. Petrich*, 101 Wn.2d 566 (1984) and *State v. Bourgeois*, 133 Wn.2d 389 (1997).

In *State v. Petrich*, our high court observed that, in some cases, the issue of credibility of the complaining witness "may be an inevitable, central issue." *State v. Petrich*, 101 Wn.2d at 575. A child victim alleged that her grandfather, Charles Petrich, abused her. On direct examination, she testified to an eight month delay in reporting the abusive incident. On cross-examination of the child, defense counsel elicited testimony that reflected an earlier opportunity to and a lack of motive to report the abuse. Because the trial court believed that defense's questioning comprised an attack on the complaining witness's credibility, the trial court permitted a State's expert to testify that a victim of child abuse often delays reporting and to aver to a correlation between the relationship between an abuser and the child and a delay in reporting. The Washington Supreme Court agreed that the defense had challenged the credibility of the victim and, therefore, the trial court properly admitted limited expert testimony.

In *State v. Bourgeois*, four witnesses testified regarding their fear and reluctance to testify on behalf of the State. Our high court concluded that admission of testimony from three of the witnesses merely served to bolster their credibility before the defense challenged their truthfulness. Therefore, the trial court committed error when admitting

14

the testimony. With regard to Frank Rojas, a fourth witness, however, the high court concluded that the trial court did not err in admitting the testimony. The record showed that Rojas gave police a false name, purposefully identified a person other than the defendant, and initially expressed uncertainty as to the identity of the assailant that he saw fleeing from the scene of the crime. Later, Rojas gave law enforcement his correct name and branded the fleer as Jeremiah Bourgeois. Under such circumstances our state Supreme Court held that the State, during direct examination, could ask Rojas about his fear to report his percipient knowledge of the crime in order to explain his inconsistent statements to police and to fend off a later attack against his credibility. Although the attack occurred after direct examination, the State reasonably could anticipate the attack.

We deem *Petrich* and *Bourgeois* distinguishable. In *State v. Petrich*, an attack on credibility occurred before the State sought to admit corroborating evidence. In *State v. Bourgeois*, the State could reasonably assume an attack on the credibility of the witness, and the attack occurred. In T.P.'s prosecution, no such attack occurred before introduction of reputation evidence.

In *State v. Petrich*, the Washington Supreme Court observed that crimes against children generally put in issue the credibility of the complaining witness when the accused denies the acts asserted by the child. This observation may suggest that the State may present testimony of the child's reputation for honesty regardless of any attack on the victim's credibility. Nevertheless, no case stands for this proposition. In the reported

15

decisions, the defense made direct attacks on the witness's veracity during questioning of the witness or another witness before the State introduced reputation testimony. In T.P.'s trial, defense counsel never questioned A.S., let alone posed questions challenging her credibility to any witness. Defense counsel never directly accused her of dishonesty in his summation.

Slut Reference

The State also questioned A.S.'s father about his daughter's reputation in the community for truthfulness. A.S. had yet to testify, but, during the earlier cross-examination of the mother, defense counsel had questioned the mother about whether her daughter had been called a slut. The State argues that the testimony about the name calling freed the State to question A.S.'s father as to A.S.'s reputation for veracity. Presumably the State also contends that testimony about this allusion retroactively justified questioning the mother about her daughter's reputation.

We note that T.P.'s counsel questioned A.S.'s mother about the slut comment because of the State's theme that A.S. suffered from depression after the alleged rape. Both parents testified to A.S.'s depression. Presumably the State wanted to convey the understanding that A.S. must have been raped because she experienced depression after, but not before, the alleged sexual assault. To counter this premise, defense counsel asked the mother and father about home schooling A.S. before the alleged rape. Counsel continued the line of questioning with queries soliciting information about home school

being prompted by bullying at school and A.S. being called a "slut." According to the State, eliciting information that one or more people called the victim a slut amounted to telling the court the victim should not be believed. Therefore, the State could present evidence corroborating A.S.'s honesty. We disagree.

Corroborating evidence is admissible only on the facet of the witness's character or testimony which has been challenged. *State v. Froehlich*, 96 Wn.2d 301, 305 (1981). In the context of impeachment, evidence of a witness's prior misconduct is admissible only if it is probative of the witness's character for truthfulness under ER 608. *State v. Stockton*, 91 Wn. App. 35, 42, 955 P.2d 805 (1998). For example, drug possession and use are not probative of truthfulness because they have little to do with a witness's credibility. *State v. Hardy*, 133 Wn.2d 701, 709, 946 P.2d 1175 (1997); *State v. Stockton*, 91 Wn. App. at 42.

We analogize purported sexual activity to alleged consumption of unlawful drugs. Even assuming that A.S. engaged in other sexual activity or maintained a reputation for unchastity, such conduct or repute lacked any relationship to her believability or reputation for fidelity. We also emphasize that the defense presented no evidence that A.S. was a slut, only that one or more colleagues at school had called her a slut. The name calling could be the product of meanness, not of the accuracy of the epithet. The evidence presented by the defense did not release the State to present testimony concerning the reputation of A.S.

Rape Shield Statute

The State next contends that, by introducing evidence of A.S. being called a "slut," the defense violated the rape shield statute and thereby opened the gate for testimony rehabilitating A.S. as an honest witness. For the same reason we concluded that the name calling lacked relevance to A.S.'s believability, we reject this additional contention.

RCW 9A.44.020, known colloquially as the rape shield statute, reads in pertinent part:

> (2) Evidence of the victim's past sexual behavior including but not limited to the victim's marital history, divorce history, or general reputation for promiscuity, nonchastity, or sexual mores contrary to community standards is inadmissible on the issue of credibility and is inadmissible to prove the victim's consent except as provided in subsection (3) of this section.

Subsection 3 of the statute allows introduction of past sexual history on the issue of consent but only with advance approval by the trial court preceded by a motion.

The defense asked A.S.'s parents about their daughter being called a slut not for the purpose of showing she was a slut but to counter the State's factual position that A.S. suffered depression resulting from a rape. Therefore, the defense did not violate the statute. RCW 9A.44.020 also precludes evidence of a reputation for promiscuity. In the context of a junior high school, a female could be called a slut simply as a pejorative term, not because of sexual activity.

18

No. 37159-0-III
*State v. T.P.*

*Foundation for Reputation Testimony*

We move to the subject of the method of introducing evidence to rebut an attack on a victim's or a witness's credibility. The rules surrounding testimony on reputation coincide regardless of whether the proponent seeks introduction of the evidence to rehabilitate a victim or a witness. ER 404(a) allows evidence of a pertinent trait of character of the victim to rebut a challenge to that trait, and ER 608(a) allows evidence as to a witness's character for truthfulness if the opponent attacked the witness's credibility. Neither rule informs us of the method of respectively rehabilitating the victim or witness.

ER 405(a) controls the methods for proving a witness's character. The rule declares:

> **Reputation**. In all cases in which evidence of character or a trait of character of a person is admissible, proof *may be* made by testimony as to reputation. On cross examination, inquiry is allowable into relevant specific instances of conduct.

(Emphasis added.) Although the rule does not state that inquiry into a person's character *shall be* by testimony to reputation, Washington follows the traditional common law rule that proof of character is limited to testimony concerning reputation. Rule 405. Methods of Proving Character, 5D KARL B. TEGLAND, WASHINGTON PRACTICE: COURTROOM HANDBOOK ON WASHINGTON EVIDENCE ER 405 author's cmt. 405:1 (2020 ed.). One cannot express a personal opinion as to a witness's veracity. *State v. Woodard*, 26 Wn. App. 735, 738, 617 P.2d 1039 (1980).

19

A party seeking to admit evidence bears the burden of establishing a foundation for that evidence. *State v. Land*, 121 Wn.2d 494, 500, 851 P.2d 678 (1993). According to *State v. Kelly*, 102 Wn.2d 188, 194, 685 P.2d 564 (1984), the method of proving reputation, since 1919, has been governed by this procedure:

> The orderly and proper way to put in evidence of this sort, after the witness has testified to acquaintanceship with the defendant not too remote in point of time, is to have the witness answer No or Yes, as the fact is, to the question, if he knows what the general reputation of the defendant is, in the community in which he resides, for the particular trait of character (naming it) that is relevant to and involved in the crime with which the defendant is charged. If the witness answer No, that ends the inquiry. If he answer Yes, then the next and final question should be, What is it, good or bad?

*State v. Argentieri*, 105 Wash. 7, 10, 177 P. 690 (1919). This passage does not require the proponent of the evidence to draw from the witness the basis on which the witness has learned the reputation of another. The passage also does not suggest that the opponent of the evidence may voir dire or cross-examine the witness as to the witness's basis of knowledge. Still, such questioning should be permitted or else the testimony of reputation becomes worthless, or worse, the trier of fact accepts the testimony and grounds a conviction on such reputation despite the reputation being based on rare air.

One Washington case stands for the proposition that, in order to offer reputation testimony, a witness must lay a foundation establishing that he or she bases the subject's reputation on perceptions in the community. *State v. Thach*, 126 Wn. App. 297, 315, 106 P.3d 782 (2005), *overruled on other grounds by State v. Case*, 13 Wn. App. 2d 657, 466

P.3d 799 (2020). A Washington Supreme Court decision reads that, to establish a valid community, the party seeking to admit the reputation evidence must show that the community is both neutral and general. *State v. Land*, 121 Wn.2d 494, 500 (1993).

Although the quote from *State v. Argentieri* refers to "the community in which [the witness] resides," Washington courts do not apply this principle literally. ER 405 does not limit the reputation to the person's residential neighborhood. The witness can testify to a reputation among business associates or coworkers. *State v. Land*, 121 Wn.2d 494, 500-01 (1993); *State v. Callahan*, 87 Wn. App. 925, 936, 943 P.2d 676 (1997). Nevertheless, as already stated, to be admissible, the reputation must exist within a neutral and generalized community. *State v. Gregory*, 158 Wn.2d 759, 805, 147 P.3d 1201 (2006) *overruled on other grounds by*, *State v. W.R., Jr*, 181 Wn.2d 757, 336 P.3d 1134 (2014); *State v. Callahan*, 87 Wn. App. at 934. Reputation among a limited group of persons may not accurately reflect the witness's general character for truthfulness. 5D TEGLAND, *supra*, ER 405 author's cmt. 405:2.

A person's reputation among members of a family is inadmissible. *State v. Thach*, 126 Wn. App. 297, 315 (2005). In *State v. Gregory*, 158 Wn.2d 759, 805, 147 P.3d 1201 (2006), the Supreme Court affirmed the trial court's exclusion of testimony of the victim's family members as to the victim's reputation of honesty among family. The Washington Supreme Court noted:

21

First, the inherent nature of familial relationships often precludes family members from providing an unbiased and reliable evaluation of one another. In addition, the "community" with which Larson had discussed R.S.'s reputation included only two people, Larson and R.S.'s sister. Any community comprised of two individuals is too small to constitute a community for purposes of ER 608.

*State v. Gregory*, 158 Wn.2d at 805.

In T.P.'s trial, the State exerted no attempt to lay a foundation with regard to the purported community in which A.S. possessed a reputation for truthfulness. The trial court overruled an objection to questioning A.S.'s mother as to whether A.S. has "a reputation in the community as being someone who makes things up?" RP at 45. Later when defense counsel established that the mother had spoken to no one about the reputation, the trial court refused to strike the testimony. A.S.'s father also testified about A.S.'s "reputation in the community for truthfulness," without any foundation as to the basis of his knowledge of the reputation. RP at 55-56. As parents, the father and mother are unlikely to represent a general or neutral community. Thus, even assuming the defense assailed the credibility of A.S. such that the State could introduce evidence of A.S.'s reputation for truthfulness, such evidence lacked a foundation and should have been precluded.

The State may suggest that it need not have followed the foundational rules to introduce testimony from the parents because either T.P. challenged the credibility of A.S. or A.S.'s credibility was automatically in issue because of the nature of the charge.

No case stands for this proposition. In all decisions wherein the court addressed the necessary foundation for reputation evidence, the credibility of a witness was challenged. If we accepted the State's suggestion, we would nearly destroy the impact of ER 405.

We are uncertain as to whether either parent actually testified to A.S.'s purported reputation as opposed to each parent declaring his or her respective personal view of A.S.'s honesty. To repeat, the following colloquy occurred with A.S.'s mother:

> Q Does A.S. have a reputation in the community as being somebody who makes things up?
> MR. BARKER [Defense Counsel]: Well, first you have to define the community, so I'm going to object to that as well. And who she talked to about this, etc.
> THE COURT: The Court will overrule that objection.
> [A.S.'s mother]: No, she's not the kind of person that would make something up, no.

RP at 45. The answer illustrates that A.S.'s mother wanted to answer as to her observations and views of her daughter, not to any reputation of the daughter. Although the State's attorney repeated the question and the mother answered in the negative without editorializing, the die had been cast.

The prosecution asked A.S.'s father:

> Q Mr. [S], to your understanding, does A.S. in the community have a reputation for truthfulness?
> [Father]: Yes.

RP at 56. One could take this question as asking whether or not A.S. simply had a

reputation with the expectation that the next question would inquire as to whether the

reputation was bad or good.

In line with our holding that the State never laid the proper foundation for A.S.'s

parents to testify to her reputation for truthfulness, we observe that a child does not gain a

reputation for veracity just because no one has complained to either parent that the child

fibbed.

Bench Trial Presumption

We must now decide if the introduction of the parents' testimony about A.S.'s

reputation for truthfulness was harmless. In this regard, we face a unique rule with

regard to harmless error. The State relies on a presumption that the juvenile court judge

did not consider inadmissible evidence in reaching a verdict.

Juvenile court trials are always bench trials. In Washington State, in the absence

of evidence to the contrary, a reviewing court will presume the judge in a bench trial does

not consider inadmissible evidence in rendering a verdict. *State v. Read*, 147 Wn.2d 238,

242, 53 P.3d 26 (2002). The presumption, known as the *Read* presumption, is rebuttable,

however. *State v. Gower*, 179 Wn.2d 851, 855-56, 321 P.3d 1178 (2014).

We reject the presumption in this appeal for several reasons. First, the

presumption "depends entirely on our recognition that the trial judge knows the rules of

evidence and will therefore discount truly inadmissible evidence when making a decision

in a bench trial." *State v. Gower*, 179 Wn.2d 851, 856 (2014). We respectfully conclude that the trial court did not know the relevant rules applicable to T.P.'s trial. Twice the trial court overruled timely and cogent objections to the parents' testimony about the reputation of their daughter when the testimony lacked any foundation. The evidence also should not have been heard, let alone considered, by the court because T.P.'s counsel had never impeached A.S.

Second, a defendant can rebut the presumption by showing the verdict is not supported by sufficient admissible evidence or the trial court relied on the inadmissible evidence to make essential findings that it otherwise would not have made. *State v. Read*, 147 Wn.2d 238, 245-46 (2002). We conclude that sufficient admissible evidence supported the guilty conviction. Nevertheless, for the juvenile court to reach a finding of guilt, the court needed to find A.S. to be credible. The parents' inadmissible testimony vouched for the credibility of A.S. The juvenile court may have found A.S. credible without the parents' vouching, but we cannot discern such a finding to be likely.

In *State v. Read*, 147 Wn.2d 238, the trial court admitted irrelevant opinion testimony. Nevertheless, the defendant failed to show that the trial court relied on the testimony when it made its findings. Our high court held admission of the evidence did not constitute reversible error.

In *State v. Gower*, 179 Wn.2d 851, 856 (2014), the Washington Supreme Court rejected application of the *Read* presumption. The trial court admitted evidence of David

25

Gower's prior sexual misconduct. The trial court expressly stated in its conclusions of law that the evidence was legally admissible and it also stated that the State could rely on the evidence in its case in chief.

In *State v. Gower*, the Supreme Court reviewed the entire findings, conclusions, and transcript when deciphering whether the trial court relied on impermissible evidence of earlier sex crimes when finding David Gower guilty of indecent liberties and incest. The dissent criticized the majority because the findings of fact and conclusions of law did not expressly state that the trial court, in the bench trial, relied on the earlier convictions.

After reviewing the entire trial transcript in T.P.'s prosecution, we also conclude that the trial court probably relied on the inadmissible evidence when determining the credibility of A.S. and the guilt of T.P., despite the juvenile court never expressly mentioning reliance on the parents' testimony. The State of Washington held the burden of proving the lack of consent from A.S. The credibility of A.S. was essential to a finding of lack of consent. Although the juvenile court did not expressly state the reasons for finding A.S. truthful, the court wrote that it considered the testimony of all the witnesses when reaching its ruling. Of course, the testimony included the parents' averring as to the truthfulness of their daughter. The testimony of a good reputation came from two sources.

The State contends the record does not support a conclusion that the trial court relied on the reputation testimony of A.S.'s parents. Nevertheless, the State also posits

that this prosecution was a "'he said/she said' kind of case."  Brief of Resp't, at 13.

Presumably the State sought to bolster the credibility of A.S. by the testimony of the

parents because of this nature of the case.

In *S.B. v. State*, 255 So. 3d 497 (Fla. Dist. Ct. App. 2018), the reviewing court

reversed a juvenile's conviction for robbery.  During the testimony of the accused, S.B.,

the State asked him if he had any witnesses corroborating his story of being in another

location at the time of the robbery.  Defense counsel objected to the question as shifting

the burden of proof.  The trial court overruled the objection.  On appeal, the state court of

appeals first ruled that the question was objectionable.  The reviewing court then

concluded that, because the trial court overruled the objection and because the trial court

never stated that he did not rely on the testimony, the trial court likely relied on

impermissible evidence.

Evidentiary error requires reversal only if the error results in prejudice.  *State v.*

*Neal*, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001).  Improper admission of evidence

constitutes harmless error if the evidence is of minor significance in reference to the

evidence as a whole.  *State v. Neal*, 144 Wn.2d at 611.  The test becomes whether there is

a reasonable probability that the outcome of the trial would have been different without

the inadmissible evidence.  *State v. Gower*, 179 Wn.2d at 857.  For the same reason that

we decline application of the *Read* presumption, we conclude the outcome of the trial

would likely have been different without the juvenile court considering the parents' testimony.

The State argues that substantial evidence supported the verdict and therefore any alleged error was harmless. A harmless error analysis "does not turn on whether there is sufficient evidence to convict without the inadmissible evidence." *State v. Gower*, 179 Wn.2d 851, 857 (2014).

## CONCLUSION

We reverse the conviction of T.P. for third degree rape and remand for a new trial.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Lawrence-Berrey, J.

_____
Pennell, C.J.

28