# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57160-9-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| BRIAN A. WESTBROOK, | |
| Appellant. | |

CHE, J. — Brian A. Westbrook appeals his judgment and sentence and the trial court's denial of his CrR 7.5 motion for a new trial. Westbrook argues that the trial court (1) abused its discretion by denying his motion for a new trial because a juror's nondisclosure of his relationship with the elected prosecutor violated his right to a fair and impartial trial, (2) abused its discretion by admitting evidence of flight, and (3) improperly imposed a $500 crime victim penalty assessment (VPA).

We hold that (1) Westbrook fails to show that the trial court abused its discretion by denying his motion for a new trial, (2) the admission of evidence of Westbrook's flight was harmless error, and (3) the VPA should be stricken.

Accordingly, we affirm Westbrook's convictions but remand for the trial court to strike the VPA.

FACTS

I. BACKGROUND

MC and Westbrook began dating in 2020 and moved in together in 2021. MC had two children prior to dating Westbrook, ALA and AJA. Westbrook watched MC's kids while MC worked. Westbrook drove MC to work "most of the time." Rep. of Proc. (RP) at 339.

One day, Westbrook drove MC to work and told her children he would be back after he dropped off MC. MC called a friend to retrieve her children from the house before Westbrook could return. MC decided to flee from Westbrook that day because Westbrook had been acting paranoid, agitated, and angry. His actions over the prior two months scared her. MC gave her phone to her boss, fearing it was being tracked. The next day, MC saw Westbrook at her workplace, and security removed Westbrook from the property.

Police interviewed MC and MC's 13-year-old daughter, ALA. ALA reported Westbrook sexually assaulted her on multiple occasions when she was between 12-13 years old. Police also interviewed MC's 7-year-old son, AJA, who reported that Westbrook picked him up by his throat and set him back down, and that Westbrook had "thrown him" in the past. Clerk's Papers (CP) at 8.

Officer Kyle Stockdale attempted to contact Westbrook at his residence "a handful of times" but did not personally ever locate Westbrook. RP at 552. The State charged Westbrook with five counts of second degree child rape, five counts of second degree child molestation, one count of harassment—threat to kill, and one count of fourth degree assault. Westbrook was arrested in California and extradited to Washington. Westbrook's case proceeded to jury trial.

## II. TRIAL

Prior to trial, Westbrook moved to exclude evidence of his arrest in California and extradition to Washington. Westbrook argued there was no evidence indicating he knew that law enforcement was seeking to serve him with criminal charges or anything of the like. The State sought admission of evidence that Westbrook "fled to California." RP at 24. The trial court admitted the evidence of flight because "the State's entitled to tell the whole story of what happened . . . [Westbrook] was not where he was supposed to be, where everyone expected him to be, and he could not be found, he was eventually found sometime later." RP at 25.

During voir dire, juror 11 was known to the parties as a state legislator and local attorney, who had experience working in both criminal defense and criminal prosecution. The trial court asked the jury panel whether anyone knew Westbrook, the trial attorneys, the judge, or witnesses. Juror 11 shared that he knew Westbrook's attorney, one of the trial prosecutors, the trial judge, and a witness. Juror 11 was asked multiple times about his ability to be fair and impartial to both sides given the nature of his employment and acquaintance with the trial attorneys for both parties. Juror 11 advised he could be fair and impartial to both sides. The trial court also asked if any juror had "any other reason that I haven't mentioned, why you just absolutely cannot be fair and impartial in this case? Any reasons that I haven't thought of?" RP at 70. No juror responded in the affirmative.

Neither party challenged juror 11 or moved to excuse him for cause. Westbrook did not use any of his peremptory challenges. Juror 11 went on to serve as the presiding juror.

The witnesses testified consistently with the facts above. Additionally, MC testified that Westbrook never told her about any plans to go to California by himself, and that she was not

3

aware of any such plans. MC further testified that to the extent they had conversations about going to California, the conversations revolved around taking the entire family. MC stated that Westbrook had been living in Washington "off and on his whole life" and had not visited California, where he was originally from, since July 2014. RP at 394.

The State, in its closing argument rebuttal, argued that Westbrook's arrest in California was evidence of his "consciousness of guilt," "[w]hen after seven years of never having been to California, all of a sudden that's where [Westbrook] needed to be with no -- no advance notice." RP at 756.

The jury convicted Westbrook on four counts of second degree child rape, five counts of second degree child molestation, and one count of fourth degree assault. The jury acquitted Westbrook of one count of second degree molestation and one count of harassment—threat to kill.

Immediately prior to sentencing, the trial judge informed counsel that the judge had inadvertently received information that juror 11 and another person shared season tickets to a professional hockey team with the elected prosecutor, not the trial prosecutors. The judge also learned that the elected prosecutor attended a hockey match during the time that juror 11 served as a juror but did not attend the match with juror 11.

### III. MOTION FOR A NEW TRIAL

Westbrook moved for a new trial under CrR 7.5 or relief from judgment under CrR 7.8, arguing he was unaware of any relationship between juror 11 and the elected prosecutor, and he would not have agreed to accept juror 11 if he had known.

4

After the hearing, the trial court entered the following findings of fact: The elected prosecutor and his wife contributed $250 of the $88,130 raised by juror 11's election campaign for state legislator. In 2022, the elected prosecutor and his wife contributed $50 of the $43,365 raised for juror 11's reelection campaign. The elected prosecutor was unaware of juror 11's jury service until after the trial had commenced. The elected prosecutor had no contact with juror 11 during juror 11's jury service.

The trial court also found that: In March 2018, the elected prosecutor, juror 11, and a third party pooled their money together to purchase season tickets for a Seattle hockey team. In August 2021, the tickets were divided between the three purchasers based on a predetermined number of games each purchaser would attend. No other exchange of tickets was made, neither during the trial nor during juror 11's jury service.

The trial court concluded Westbrook was not entitled to relief under CrR 7.8(b) because he had yet to be sentenced or have final judgment entered in his case. The court further held that Westbrook was not entitled to relief under CrR 7.5 because he had not presented evidence meeting the threshold for implied juror bias. Additionally, the trial court determined that Westbrook's allegations involved facts outside the record, which must be proven with competent evidence; there was no evidence of actual bias by juror 11; the professional relationship between the elected prosecutor and juror 11 did not meet the definition of consanguinity or affinity within the fourth degree; the elected prosecutor and juror 11 had no familial relation, no business or employment network, or other association defined by law; and there was no evidence of improper conduct by a juror which denied Westbrook of a substantial right.

The trial court sentenced Westbrook and imposed a $500 VPA.

5

In March 2022, Westbrook appealed his judgment and sentence. Westbrook then moved for remand under RAP 9.11. We granted Westbrook's RAP 9.11 motion and remanded this matter to the trial court to take additional evidence regarding newly discovered information concerning juror misconduct alleged in Westbrook's CrR 7.5 motion.

On remand, the trial court entered supplemental findings of fact, including: Juror 11 is a member of the Washington State Bar Association and practices law in Lewis County. The elected prosecutor endorsed juror 11's campaign for city council in 2015 and was asked by juror 11 to make an endorsement video, which was posted to juror 11's social media page. Juror 11 ran for State Representative twice and is currently a State Representative. In 2020, the elected prosecutor emceed the campaign kick-off breakfast for juror 11's election campaign.

Juror 11 hosted a local radio talk show on AM radio for approximately five years. In April 2020, juror 11 cohosted the show with the elected prosecutor, introducing the elected prosecutor as a "good friend to the show" and noted that the elected prosecutor filled in for him as host "a lot last year." CP at 273. They discussed Governor Jay lnslee's decision to release prison inmates amid COVID-19.[1] The elected prosecutor provided a legal definition for non-violent offenses, which included third degree child molestation. Juror 11 stated, "We're talking about [a] non-violent [crime]. Do you want a child molester released? I mean that is a huge deal." CP at 274. Juror 11 and the elected prosecutor opined the Governor was "allowing inmates to dictate criminal justice reform" by authorizing their release. CP at 274.

---

[1] In February 2020, Governor Jay Inslee declared a state of emergency in Washington State in response to the outbreak of the COVID-19 virus. Proclamation of Governor Jay Inslee, No. 20-25 (Wash. Mar. 23, 2020), https://governor.wa.gov/sites/default/files/proclamations/20-25%20Coronavirus%20Stay%20Safe-Stay%20Healthy%20%28tmp%29%20%28002%29.pdf.

Two days after the show, juror 11 posted a video to his social media page of the elected prosecutor standing in front of juror 11's campaign sign stating, "I'm supporting [juror 11] because I want to keep the 20th District strong and I'm asking you to do the same." CP at 274. On the same day, juror 11 posted a message stating, "Thank you [elected prosecutor] for your support of my campaign endorsement. [He] and I have supported each other for many years before he joined [the] Lewis county Prosecutor's Office. I appreciate his support and friendship." CP at 274.

In May 2020, juror 11 posted an additional video of the elected prosecutor's endorsement to social media. In that video, the elected prosecutor is pictured standing at a podium with juror 11's campaign sign in the background. In the video, the elected prosecutor states, "We are living in uncertain times and need strong leadership in Olympia working for us. I'm [the elected] Lewis County Prosecuting Attorney [ ] asking you to join me by supporting and electing [juror 11] as our state representative. [Juror 11] works tirelessly to improve our community and will carry that work ethic to Olympia where we need him most. Learn more about how you can support and elect [juror 11] as our state representative at [website]." CP at 274. On the same day, juror 11 commented on the social media endorsement by the elected prosecutor and stated, "Lewis County Prosecuting Attorney [ ] endorses and supports the Campaign to Elect [juror 11]." CP at 274. Three days later, the elected prosecutor again appeared as a cohost on the radio show, wherein he and juror 11 took phone calls from listeners concerning the Governor's release of prison inmates in response to COVID-19.

Previously, on multiple occasions, juror 11 and the elected prosecutor collaborated on legislation involving both criminal and civil matters. At the time of juror 11's jury service in this

case, juror 11 was aware that the elected prosecutor had donated to his campaign in 2020 and 2022. Neither the elected prosecutor nor juror 11 disclosed the campaign endorsement videos or the radio show during jury selection, or in their subsequent affidavits prepared in response to Westbrook's motion for a new trial.

The elected prosecutor had no direct involvement in Westbrook's trial. The elected prosecutor was unaware of juror 11's jury service until after juror 11 was selected and sworn as a juror. The elected prosecutor had no contact with juror 11 during his service as a juror.

The trial court did not make any supplemental or amended conclusions of law in this matter.

Westbrook appeals.

## ANALYSIS

### I. MOTION FOR A NEW TRIAL

Westbrook argues that the trial court abused its discretion by denying his motion for a new trial because the relationship between juror 11 and the elected prosecutor violated his right to a fair and impartial jury trial. We disagree.

A. *Legal Principles*

We review a trial court's denial of a motion for a new trial for an abuse of discretion. *State v. Meza*, 26 Wn. App. 2d 604, 609, 529 P.3d 398 (2023). A trial court abuses its discretion when its decision is based on untenable grounds or made for untenable reasons. *Id.* at 609. A trial court's findings of fact stand if they are supported by substantial evidence. *See Id.* at 610.

We treat juror nondisclosure like other nonconstitutional errors that warrant a new trial only on an affirmative showing of prejudice. *State v. Lupastean*, 200 Wn.2d 26, 31-32, 513 P.3d

781 (2022). The denial of a motion for a new trial "should be overturned only when there is a substantial likelihood that the prejudice affected the verdict." *Id.* at 54 (internal quotation marks omitted) (quoting *State v. Gamble*, 168 Wn.2d 161, 177, 225 P.3d 973 (2010)). We look to whether the moving party "has been so prejudiced that nothing short of a new trial can insure that [they] will be tried fairly." *Id.* (internal quotation marks omitted) (quoting *Gamble*, 168 Wn.2d at 177).

Actual bias and implied bias are bases, among others, to challenge jurors for cause. RCW 4.44.170 (1), (2).

> A juror's failure to disclose information that is properly and understandably requested during jury selection will certainly require a new trial if the undisclosed information reveals the juror's actual or implied bias. This is true regardless of whether the juror's failure to disclose was intentional because "'[a] trial by a jury, one or more of whose members are biased or prejudiced, is not a constitutional trial.'"

*Lupastean*, 200 Wn.2d at 53 (quoting *State v. Berhe*, 193 Wn.2d 647, 658, 444 P.3d 1172 (2019)).

In exceptional cases, a conclusive presumption of implied bias will be drawn when a prospective juror deliberately withholds information during voir dire to increase their chance of being seated on a jury. *Id.* at 54. The prejudicial effect of nondisclosure may be heightened where the juror later injects the nondisclosed information into jury deliberations. *Id.*

B.      *Juror 11 Was Not Actually Biased*

Before the trial court heard additional evidence about juror 11's participation in a radio show, it ruled there was no evidence of actual bias by juror 11. Westbrook now asserts that the supplemental findings show juror 11 was actually biased because juror 11, in a radio show episode that aired over a year prior to the trial, made a comment that convicted "child molesters"

9

should not be released from prison as part of the governor's response to COVID-19. Br. of Appellant at 18. We disagree.

To prove juror 11 should have been disqualified for actual bias, Westbrook must demonstrate "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." RCW 4.44.170(2). In a challenge for actual bias, the challenged juror's expressed opinion or appearance of a formed opinion alone is insufficient to sustain the challenge. RCW 4.44.190. "[T]he court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially." RCW 4.44.190. The trial court ruled Westbrook did not meet his burden.

On the entire record presented, Westbrook does not show that the trial court abused its discretion. Juror 11's statement on the radio show episode expressed an opinion on individuals convicted of and serving sentences for non-violent offenses—particularly third degree child molestation—and whether they should be released early as part of the governor's plan to address the COVID-19 outbreak. But at that time, Westbrook had not been convicted of and had not been serving a sentence for any offense, let alone a non-violent child sex offense. Because Juror 11's radio show comment was about those who had been convicted, not simply accused, of sex offenses, it was unrelated to Westbrook's circumstances. Moreover, Westbrook fails to make an affirmative showing of prejudice and does not show a substantial likelihood that such prejudice affected the verdict. *Lupastean*, 200 Wn.2d at 54. Thus, the trial court did not err in concluding that there was no evidence of actual bias by juror 11, and nothing in the supplemental findings undermines that conclusion.

C.       *Juror 11 Was Not Impliedly Biased*

Westbrook contends juror 11 was impliedly biased because juror 11 and the elected prosecutor were "partners in the business of getting [juror 11] elected and in discussing legislation and other governmental activities" and were also "partners in broadcasting that information to the public and answering the public's call-questions during their radio appearances." Br. of Appellant at 16-17. We disagree.

Implied bias is defined in RCW 4.44.180(2), which includes in relevant part that a "challenge for implied bias may be taken" where a juror and a party "[stand] in the relation of . . . a partner in business with [ ] a party." The trial court ruled Westbrook did not meet his burden of showing juror 11 and the elected prosecutor were partners in business.

While juror 11 and the elected prosecutor engaged in political discussions on a local radio show, and the elected prosecutor endorsed juror 11's campaign for city council in 2015 and donated nominal amounts of money to two of juror 11's campaigns, these activities do not rise to the level of business partners. The record does not show that they owned the radio show together nor does Westbrook demonstrate that nominal campaign contributions and endorsements necessarily lead to the conclusion that the involved parties are business partners. Though the supplemental findings regarding the radio show and political activities demonstrate more interaction between juror 11 and the elected prosecutor than the court and litigants were previously aware of, these instances still do not establish that juror 11 and the elected prosecutor were business partners under RCW 4.44.180(2).

Westbrook contends that this is an exceptional case because juror 11 and the elected prosecutor are "licensed members of the Washington State Bar Association with knowledge of the

purpose of voir dire and their duty of candor to the tribunal," they engaged in political acitivites together, and they shared the "same opinions about the criminal justice system." Br. of Appellant at 20. While it is true that in exceptional cases courts may conclusively presume implied bias from the juror's factual circumstances, we do not find exceptional circumstances here that would warrant the application of the Sixth Amendment doctrine of implied bias.

Westbrook does not establish that juror 11 should have been disqualified for implied bias, and he does not otherwise establish that juror 11's nondisclosure prejudiced his right to a fair trial. No fact or inference arises that juror 11 wanted to serve on Westbrook's jury or realized that his likelihood of being able to serve would decrease if he disclosed that he knew the elected prosecutor and to what extent he knew the elected prosecutor. *See Lupastean*, 200 Wn.2d at 54. Furthermore, there is no indication in the record that juror 11 relayed the details of his relationship with the elected prosecutor to the other jurors during deliberations or that juror 11's relationship with the elected prosecutor affected the jury's verdict. *See Id.*

Westbrook contends that juror 11 intentionally failed to disclose his relationship with the elected prosecutor, which should lead to a presumption of implied bias. However, Westbrook does not establish that juror 11 withheld information in response to questions asked of him during voir dire. Juror 11 answered the questions posed in voir dire. No one asked juror 11 if he knew the elected prosecutor, and while the court asked the jury panel if there was any other reason why a juror "absolutely cannot be fair and impartial in this case," it is apparent that juror 11 did not think he absolutely could not be fair and impartial in Westbrook's case. RP at 70. Notably, the jury returned acquittals on two of the charges.

12

Also, Westbrook does not assign error to the trial court's finding that "[t]here is no evidence to suggest any action by [the elected prosecutor], [juror 11] or other representatives of the state was undertaken in bad faith or sought to gain an unfair advantage." CP at 271. RAP 10.3(g) requires a separate assignment of error for each finding of fact a party is challenging. Unchallenged findings of fact of verities on appeal. *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014).

The elected prosecutor had no direct involvement in Westbrook's trial nor any contact with juror 11 during his service as a juror. Furthermore, because it is not apparent that juror 11 deliberately concealed material information, later injected such information into juror deliberations, or otherwise failed to disclose information that was requested during jury selection, Westbrook fails to show that juror 11's unrequested nondisclosure was prejudicial to his right to a fair trial. Without an affirmative showing of prejudice, the trial court properly concluded Westbrook did not show implied bias by juror 11 and denied his motion for a new trial. The trial court did not abuse its discretion in doing so.

## II. EVIDENCE OF FLIGHT

Westbrook argues the trial court erred when it admitted prejudicial evidence of Westbrook's flight to California. We agree but hold that the erroneous admission of evidence of Westbrook's flight did not prejudice Westbrook and was therefore harmless error.

A.    *Legal Principles*

"Evidence of flight is admissible if it creates 'a reasonable and substantive inference that defendant's departure from the scene was an instinctive or impulsive reaction to a consciousness of guilt or was a deliberate effort to evade arrest and prosecution.'" *State v. Freeburg*, 105 Wn.

App. 492, 497, 20 P.3d 984 (2001) (quoting *State v. Nichols,* 5 Wn. App. 657, 660, 491 P.2d 677 (1971)). Evidence of flight includes evidence of actual flight, concealment, resistance to arrest, assumption of a false name, and related conduct if it allows a reasonable inference of consciousness of guilt of the crime charged. *Id.* at 497-98. An inference of consciousness of guilt "must be substantial and real, not speculative, conjectural, or fanciful." *Id.* at 498 (footnote omitted).

In determining the probative value of flight evidence as circumstantial evidence of guilt, we analyze

> the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

*Id.*; *see also State v. McDaniel*, 155 Wn. App. 829, 854, 230 P.3d 245 (2010).

We review a trial court's decision to admit or exclude evidence for abuse of discretion. *State v. Jennings*, 199 Wn.2d 53, 59, 502 P.3d 1255 (2022). A trial court abuses its discretion if no reasonable person would adopt the same conclusion reached by the trial court. *Id.* at 59. Abuse of discretion also occurs if the trial court utilizes the incorrect legal standard or depends on unsupported facts in reaching its decision. *Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 669, 230 P.3d 583 (2010).

If an erroneous admission of evidence does not result in prejudice to the defendant, such error is not grounds for reversal. *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). "[E]rror is not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred." *Id.* (quoting *State v. Tharp*, 96 Wn.2d

14

591, 599, 637 P.2d 961 (1981)). If the improperly admitted evidence is of minor significance compared to the overwhelming evidence as a whole, its admission constitutes harmless error. *Id.*

B.      *Admission of Evidence of Westbrook's Flight Was Harmless Error*

Assuming without deciding that the trial court erred by admitting evidence of flight, its admission did not result in prejudice to Westbrook, and as a result, is not grounds for reversal. Had the jury not heard evidence of Westbrook's flight to California, there was still overwhelming evidence for the jury to convict Westbrook of child rape, child molestation, and assault charges. ALA identified Westbrook as the perpetrator of the charged crimes; ALA testified to her age and numerous inappropriate sexual encounters with Westbrook to which she did not consent; ALA's mother testified that Westbrook expressed to her that he wanted to teach ALA how to have sex and wanted to have sex with ALA; one stain test from ALA's sheets showed "very strong support" for the inclusion of Westbrook's DNA; and another stain test from ALA's sheets detected Westbrook's sperm cells. AJA established sufficient facts to support the assault charge. Thus, Westbrook cannot show prejudice. Based on the evidence presented, it is not reasonably probable that the outcome of the trial would have differed had the flight evidence not been admitted.

We hold that the allegedly erroneous admission of evidence of Westbrook's flight did not prejudice Westbrook and, therefore, was harmless error.

### III. LEGAL FINANCIAL OBLIGATION

Westbrook argues this court should strike the VPA because the trial court found he was indigent at the time of sentencing. We agree.

No. 57160-9-II

The amended RCW 7.68.035(4) requires that no VPA be imposed if the trial court finds at the time of sentencing that the defendant is indigent as defined in RCW 10.01.160(3). The amended RCW 7.68.035(4) applies to Westbrook because this case is on direct appeal. *See State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023).

At sentencing, the trial court found Westbrook was indigent at the time of his first appearance, that this had not changed at sentencing, and that he was unable to pay legal financial obligations. Because the trial court found at sentencing that Westbrook was indigent and this case is on direct appeal, we remand to the trial court to strike the VPA.

CONCLUSION

We affirm Westbrook's convictions but remand for the trial court to strike the VPA.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Lee, J.

Veljacic, A.C.J.

16